**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RA'ZULU S. UKAWABUTU, | : | |
| | : | Civil Action No. 06-837 (NLH) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| RONALD H. CATHEL, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

RA'ZULU S. UKAWABUTU, Petitioner Pro Se
# 236126/SBI #487907B
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625

PETER J. GALLAGHER, ESQ.
Atlantic County Prosecutor's Office
4997 Unami Blvd., P.O. Box 2002
Mays Landing, New Jersey 08330
Counsel for Respondents

**HILLMAN**, District Judge

This matter is before the Court on Petitioner Ra'zulu S.
Ukawabutu's petition for habeas corpus relief under 28 U.S.C.
§ 2254. For reasons discussed below, the petition for habeas
corpus relief will be denied for lack of merit.

I.   <u>BACKGROUND</u>

A.   <u>Statement of Facts</u>

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, <u>see</u> 28 U.S.C. § 2254(e)(1), will simply reproduce the Appellate Division's factual recitation, as set forth in its April 25, 1994 published Opinion on petitioner's direct appeal from his conviction:

> On December 21, 1988, defendant, Darryl Welsh and Terry Bailey, agreed to rob the victim, Jessie Rice, to obtain money for the Christmas season.  On December 22, 1988, defendant was armed with a nine millimeter handgun and gave Bailey a .22 caliber weapon.  Welsh was armed with a .357 magnum.  They waited for Rice to arrive at the home of his girlfriend on Illinois Avenue in Atlantic City.  After Rice arrived, he began to walk towards his girlfriend's home. Defendant and his accomplices approached Rice from the rear. After forcing Rice to walk around the block, the group returned to Rice's automobile and Welsh ripped a gold chain from Rice's neck and removed $50 from his person.  Rice was forced to enter the front passenger seat of his vehicle. Defendant and Welsh sat in the rear seats, and Bailey drove. The group attempted to force Rice to reveal the specific location of his residence in Pleasantville, but Rice refused to respond.  Bailey drove to a wooded area near Pleasantville where defendant forced Rice to exit the vehicle and to lie on the ground.  Defendant switched weapons with Bailey and, using the .22 caliber pistol, defendant shot Rice seven times in the head.  The trio then proceeded in Rice's automobile to a convenience store, purchased gasoline in a container, and proceeded to another secluded area where, after vandalizing the vehicle, they set the vehicle on fire and left the area. During the guilt phase of the proceedings, Welsh and Bailey, who testified for the State, indicated they urged defendant not to shoot Rice.  However, he ignored these pleas.
>
> On July 11, 1989, at 6:30 a.m., the trio was brought to police headquarters for questioning.  Each man denied any involvement in the homicide and sometime after 1:00 p.m.

2

they were separately released.  That afternoon, Bailey gave incriminating information to the police which was then confirmed by Welsh.  At approximately 6:00 p.m., Jackson[1] was brought back to police headquarters and during the ensuing interview, taped statements of Bailey and Welsh were played for defendant.  Bailey and Welsh were also brought into the interview area.  They talked and argued with defendant.  Ultimately, defendant admitted he shot Rice.  He then proceeded to provide a detailed confession.

State v. Jackson, 272 N.J. Super. 543, 547-48, 640 A.2d 863, 865-66 (App. Div. 1994).

B.   Procedural History

Petitioner, Ra'zulu S. Ukawabutu ("Ukawabutu"), also known as Shawn Jackson, was indicted by an Atlantic County Grand Jury in 1989, on eleven counts as follows: possession of a weapon without a permit (Counts One and Three); possession of a weapon for an unlawful purpose (Counts Two and Four); conspiracy to commit kidnapping (Count Five); kidnapping (Count Six); conspiracy to commit robbery (Count Seven); robbery (Count Eight); criminal mischief (Count Nine); felony murder (Count Ten); and knowing or purposeful murder (Count Eleven).  On November 5, 1990, a superseding indictment was filed, charging Ukawabutu with capital murder, or purposefully or knowingly causing death by his own conduct, and making petitioner eligible for the death penalty.  (Ra3-Ra4).[2]

---

[1]  Petitioner Ra'zulu S. Ukawabutu was tried and convicted under the name Shawn Jackson.

[2]  The voluminous state court record relevant to this matter is designated by reference to the Respondents' Appendix ("Ra").

Trial commenced on May 14, 1991, before the Honorable Robert Neustadter, J.S.C. Ukawabutu, represented by counsel, waived his right to a jury trial. An evidentiary hearing was conducted, pursuant to N.J. Evid. R. 8 (now N.J.R.E. 104), to determine whether petitioner's confession could be admitted at trial. Judge Neustadter ruled the confession admissible. The guilt phase of the trial began and concluded on May 15, 1991. Judge Neustadter found Ukawabutu guilty on all counts. (Ra4).

The penalty phase of the trial also occurred in one day, on May 20, 1991. The trial judge rejected the death penalty, finding insufficient evidence to support two of the aggravating factors, and in any event, the aggravating factors did not outweigh the mitigating factors. On June 20, 1991, Ukawabutu was sentenced to an aggregate term of life imprisonment plus fifteen years, with a 35-year parole ineligibility. (Ra4-Ra5).

Petitioner, through assigned counsel, promptly filed a notice of appeal to the Superior Court of New Jersey, Appellate Division, challenging his conviction and sentence. (Ra42). Counsel filed a brief raising three points of error: (1) defendant did not knowingly and intelligently waive his right to a jury trial; (2) defendant's confession was not voluntarily made and its admission violates due process; and (3) the sentence was excessive. Petitioner filed a pro se supplemental brief, alleging that his statement was taken in violation of his Fifth

4

Amendment right to remain silent and that police failed to scrupulously honor this right once invoked.  He also alleged that his Fourth Amendment rights were violated because his custodial interrogation was the result of an unlawful arrest, thus mandating reversal of the conviction.  Ukawabutu further argued that the trial court's consideration of hearsay statements made by a non-testifying witness violated petitioner's Sixth Amendment right to confront witnesses.  On April 25, 1994, the Appellate Division filed an Opinion reversing the trial court's ruling that petitioner's confession was admissible.  In particular, the court held that remand was required to determine whether an allegedly inculpatory statement, made after the police had continued questioning petitioner despite his request to remain silent, tainted petitioner's later confession.  The court also held that petitioner had knowingly and intelligently waived his right to a jury trial.  State v. Jackson, 272 N.J. Super. 543, 640 A.2d 863 (App. Div. 1994).

On or about May 26, 1994, the State obtained a stay of judgment, and filed a motion for leave to appeal the interlocutory order to the Supreme Court of New Jersey.  The New Jersey Supreme Court denied the interlocutory appeal by Order filed on July 8, 1994.[3]  (Ra1271).

_____

[3]  On or about May 23, 1994, petitioner also filed a pro se motion for leave to appeal the Order of Remand.  (Ra222-Ra237).  Petitioner's application sought to have the Appellate Division

A hearing was then held on September 14, 1994, before Judge Neustadter, pursuant to the remand.  Judge Neustadter filed an opinion, dated September 21, 1994, with a conforming order dated September 29, 1994, finding that petitioner's initial statement did not implicate his right to remain silent, and that the later confession was not the product of the initial statement, and that any taint was sufficiently attenuated to warrant admission of the confession at trial.  (Ra1937-Ra1946).  Petitioner appealed.

On April 5, 1995, the Appellate Division issued an Opinion affirming the conviction.  The Appellate Division held that the trial court's factual findings are supported by adequate and credible evidence in the record.  The court also addressed petitioner's claim that the sentence was excessive, as asserted in the initial appeal over which the Appellate Division retained jurisdiction after remand.  The Appellate Division affirmed the sentence.  (Ra331-Ra335).  The Supreme Court of New Jersey denied certification on June 7, 1995.  (Ra340-Ra341).

---

correct certain factual errors regarding the non-testifying witnesses and to have the Appellate Division decide Point II of petitioner's pro se supplemental brief, namely, his claim that the trial court's consideration of hearsay statements by non-testifying co-defendant violated petitioner's Sixth Amendment right to confront witnesses.  Petitioner further noted that a remand was not necessary because the Appellate Division had been provided a copy of petitioner's initial statement, contrary to the court's assertion otherwise.

On or about April 18, 1997, petitioner filed his first federal habeas petition pursuant to 28 U.S.C. § 2254.[4]  Ukawabutu v. Morton, et al., Civil No. 97-2888 (SMO).[5]  The State filed a motion to dismiss the petition as time-barred, which the district court denied in an unpublished Opinion and Order, filed on September 5, 1997, finding that petitioner had filed his habeas petition within the one-year statute of limitations period established by 28 U.S.C. § 2244.  Thereafter, the State filed another motion to dismiss the habeas petition because it was a "mixed petition", containing both exhausted and unexhausted claims.  On July 12, 1999, the district court dismissed Ukawabutu's § 2254 habeas petition, without prejudice, because petitioner had not exhausted all of his available state court remedies with respect to certain claims asserted in the petition.  The Opinion was amended on July 21, 1999.  Ukawabutu filed a motion for reconsideration of the Order dismissing his petition without prejudice.  The district court denied reconsideration in an Opinion and Order filed on August 2, 1999.

---

[4]  The docket reflects that the petition was filed on June 11, 1997, but this was the date that the district court granted petitioner's application to proceed in forma pauperis, not the actual date that the petition was received by the court for filing.

[5]  Ukawabutu filed another § 2254 habeas petition on or about June 19, 1997, Ukawabutu v. Morton, et al., Civil No. 97-3252 (SMO), which was consolidated with the earlier action, Civil No. 97-2888 (SMO), on or about September 5, 1997.

On July 16, 1999, Ukawabutu filed his first state court petition for post-conviction relief ("PCR"). (Ra1081). A PCR hearing was conducted before Judge Neustadter on April 5 and 6, 2000. Judge Neustadter denied the state PCR petition by opinion dated April 28, 2000, and conforming Order filed on June 6, 2000. Ukawabutu filed a notice of appeal on or about November 29, 2000.[6]

On October 3, 2002, the Appellate Division affirmed the denial of post-conviction relief, and the New Jersey Supreme Court denied certification on May 8, 2003.

On February 5, 2003, while the appeal from denial of the PCR petition was still pending, Ukawabutu filed a motion for a new trial based on newly discovered evidence, pursuant to N.J.Civ.R. 3:20-1, which permits the filing of such motion at any time. (Ra2096-Ra2118). A hearing was conducted on October 16, 2003, and petitioner was given the opportunity to file a supplemental

---

[6] Prior to the notice of appeal from denial of the PCR petition, which was filed by Ukawabutu's assigned counsel, on October 27, 2000, Ukawabutu filed a motion to enforce his previous requests for discovery. A hearing was scheduled for December 14, 2000, at which time, the trial court told petitioner that he would need to file an interlocutory appeal with the Appellate Division to give the trial court temporary jurisdiction to rule on the enforcement of discovery motion, because the matter was now before the Appellate Division pursuant to the November 29, 2000 Notice of Appeal. Petitioner filed the motion for an interlocutory appeal, and the Appellate Division denied the motion on February 28, 2001, without prejudice to petitioner raising the discovery issue on his appeal from denial of the PCR petition. (Ra1272).

brief.  Ukawabutu filed a supplemental brief on October 29, 2003, and the State filed a response thereto on December 2, 2003.  The trial court denied the motion for a new trial in a written opinion issued on January 27, 2004.  (Ra1972-Ra1976).  Petitioner promptly appealed, and the Appellate Division affirmed the trial court's decision in a ruling issued on December 9, 2005. (Ra2285-Ra2293).  The New Jersey Supreme Court denied certification on March 23, 2006.

Before certification was denied on March 23, 2006, Ukawabutu filed this § 2254 habeas petition on February 17, 2006. Ukawabutu also filed a motion to stay the federal habeas proceedings pending final resolution in state court, and a motion to have the § 2254 habeas petition "relate back" to petitioner's first § 2254 habeas petition filed in April 1997.  On April 11, 2006, Ukawabutu requested that the motion to stay this matter be dismissed as moot because of the New Jersey Supreme Court's denial of certification in the state court proceedings on March 23, 2006.

This Court denied Ukawabutu's motion for "relation back" of his petition in an Opinion and Order issued on October 4, 2006. (Docket Entry Nos. 15, 16).  The Court also denied petitioner's motion for reconsideration in an Opinion and Order filed on April 2, 2007.  (Docket Entry Nos. 23, 24).

The State filed an answer with a copy of the relevant state court record on August 3, 2006.  Ukawabutu filed letters on September 15, 2006 and October 30, 2006 (Docket Entry Nos. 13, 14 and 19), requesting that respondents supply the Court and petitioner with items of record omitted from the respondents' appendix.  The State responded on October 18, 2006, stating that the documents cited by petitioner are not relevant to the issues set forth in the petition.  (Docket Entry No. 17).

Thereafter, on January 4, 2007, Ukawabutu filed a motion for an evidentiary hearing.  (Document Entry No. 20).  On the same date, Ukawabutu filed his objections to the State's answer. (Document Entry No. 21).  Ukawabutu filed a supplement in support of his habeas petition on March 15, 2007.  (Document Entry No. 22).

## II.  STATEMENT OF CLAIMS

In his habeas petition, Ukawabutu raises the following claims for habeas relief:

Grounds One and Ten: Petitioner's pretrial statements were not voluntary, and were obtained in violation of his Fourth and Fifth Amendment rights.

Grounds Two, Five and Seven: Petitioner received ineffective assistance of trial counsel in violation of his Sixth Amendment rights.

Ground Three:  Prosecutorial misconduct regarding the false evidence of gang activity presented during the suppression hearing on remand.

Ground Four: Ineffective assistance of appellate counsel.

Ground Six: The police failed to scrupulously honor petitioner's invocation of his right to remain silent in violation of the Fifth Amendment.

Ground Eight: Petitioner did not knowingly and voluntarily waive his constitutional right to a jury trial.

Ground Nine: The trial court's use of an out-of-court hearsay statement of a non-testifying witness violated petitioner's rights under the Sixth Amendment.

The State answered the petition asserting several affirmative defenses.  First, the State argues that the petition is time-barred.  Second, the State asserts that the claims in the petition are procedurally defaulted.  Finally, the State argues that petitioner's claims are without merit or do not state a cognizable federal claim involving a federal constitutional violation.

### III.   STATUTE OF LIMITATIONS ANALYSIS

The limitation period for a § 2254 habeas petition is set forth in 28 U.S.C. § 2244(d), which provides in pertinent part:

> (1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—

11

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; ...

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section.

Section 2244(d) became effective on April 24, 1996 when the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") was signed into law.  See Burns v. Morton, 134 F.3d 109, 111 (3d Cir. 1998); Duarte v. Herschberger, 947 F. Supp. 146, 147 (D.N.J. 1996).  The Third Circuit has ruled that state prisoners whose convictions became final before the April 24, 1996 enactment of AEDPA are permitted one year, until April 23, 1997, in which to file a federal habeas petition under § 2254.  See Burns, 134 F.3d at 111.  See also Lindh v. Murphy, 521 U.S. 320, 326-27 (1997)("[t]he statute reveals Congress' intent to apply the amendments to chapter 153 only to such cases as were filed after the statute's enactment").

Thus, pursuant to § 2244(d), evaluation of the timeliness of a § 2254 petition requires a determination of, first, when the pertinent judgment became "final," and, second, the period of time during which an application for state post-conviction relief was "properly filed" and "pending."

A state-court criminal judgment becomes "final" within the meaning of § 2244(d)(1) by the conclusion of direct review or by

12

the expiration of time for seeking such review, including the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court.  <u>See</u> <u>Swartz v. Meyers</u>, 204 F.3d 417, 419 (3d Cir. 2000); <u>Morris v. Horn</u>, 187 F.3d 333, 337 n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13.

As noted above, where a conviction became final prior to April 24, 1996, the effective date of § 2244(d), a state prisoner has a one-year grace period after that effective date to file a § 2254 petition.  <u>Burns</u>, 134 F.3d at 111.  However, that limitations period is tolled during the time a properly filed application for state post-conviction relief is pending.  28 U.S.C. § 2244(d)(2).  An application for state post-conviction relief is considered "pending" within the meaning of § 2244(d)(2), and the limitations period is statutorily tolled, from the time it is "properly filed,"[7] during the period between a lower state court's decision and the filing of a notice of appeal to a higher court, <u>Carey v. Saffold</u>, 536 U.S. 214 (2002),

---

[7] An application is "properly filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee. In some jurisdictions the filing requirements also include, for example, preconditions imposed on particular abusive filers, or on all filers generally. But in common usage, the question whether an application has been "properly filed" is quite separate from the question whether the claims <u>contained in the application</u> are meritorious and free of procedural bar.  <u>Artuz v. Bennett</u>, 531 U.S. 4, 8-9 (2000) (footnotes and citations omitted).

and through the time in which an appeal could be filed, even if the appeal is never filed, Swartz v. Meyers, 204 F.3d at 420-24. Nevertheless, § 2244(d)(2) does not toll the one year statute of limitations during the pendency of state prisoner's petition for writ of certiorari in the United States Supreme Court.  See Lawrence v. Florida, __ U.S. __, 127 S.Ct. 1079, 1083 (2007); Stokes v. District Attorney of the County of Philadelphia, 247 F.3d 539, 542 (3d Cir.), cert. denied, 534 U.S. 959 (2001).

Here, Ukawabutu's conviction under challenge became final on or about September 7, 1995, well before AEDPA became effective. Thus, Ukawabutu had one year from April 24, 1996, the effective date of AEDPA, or until April 24, 1997, to timely file his federal habeas petition.  The record shows that Ukawabutu filed his first § 2254 habeas petition on April 18, 1997, six days before the limitations period would have expired.

That first federal habeas petition was dismissed without prejudice on non-exhaustion grounds on July 12, 1999, and amended on July 21, 1999.  The Court did not, at that time, equitably toll the limitations period while Ukawabutu's first habeas petition was pending.  See Jones v. Morton, 195 F.3d 153, 159-60 (3d Cir. 1999)(absent extraordinary circumstances, the limitations period is not equitably tolled while a mixed petition is pending before a district court); see also, Duncan, 533 U.S. at 181-82 (the filing of a federal habeas petition does not serve

14

to toll the statute of limitations).  Consequently, when
Ukawabutu's first § 2254 habeas petition was dismissed for
failure to exhaust state court remedies in July 1999, the one-
year limitations period had already expired, and he would have
been unable to bring another federal habeas petition even if he
had promptly moved to exhaust his state court remedies, which he
did on July 16, 1999 when Ukawabutu filed his first state PCR
petition.[8]

    This Court now finds that Ukawabutu's diligence in filing
his first federal habeas petition on the belief and argument that
he had raised all of his claims before the state courts on direct
review, coupled with the State's inconsistent legal positions,
presents sufficiently extraordinary circumstances to allow
equitable tolling of the limitations period during the pendency
of his first federal habeas petition.[9]  See Brinson v. Vaughn,

---

    [8]  The State argues that Ukawabutu's state PCR petition was
filed in April 2000.  Upon review of the state court record, this
Court finds that petitioner actually filed for state collateral
review on July 16, 1999.  (Ra1081).  After counsel was appointed
for Ukawabutu, assigned counsel filed a brief in support of the
PCR petition on or about January 25, 2000.  (Ra514).  It is
unclear from the record where the State happens on the date of
April 5, 2000 as the date Ukawabutu allegedly filed his state PCR
petition.

    [9]  Ukawabutu argued strenuously in his first federal habeas
proceedings that he had fairly presented his claims for state
court review before filing his habeas petition.  He also argued
that there were circumstances involving prosecutorial misconduct
that would excuse the exhaustion requirement.  The District
Court, noting the State's argument that Ukawabutu's Fourth, Fifth
and Sixth Amendment claims were not exhausted, concluded that

Ukawabutu had presented a "mixed petition" subject to dismissal
without prejudice.  (Ukawabutu v. Morton, et al., Civil No. 97-
2888 (SMO), Amended Opinion filed July 21, 1999 at Docket Entry
No. 24, pp. 8-9).  However, after the federal habeas petition was
dismissed and Ukawabutu filed his state PCR petition to "exhaust"
these claims, the State contradicted itself concerning the
federal habeas petition by arguing on state PCR review that
petitioner's claims were procedurally barred under N.J. Court
Rules 3:22-4 and 3:22-5, because they had been presented on
direct review and denied.  (See RA1101, Atlantic City
Prosecutor's April 3, 2000 letter brief opposing petitioner's
state PCR petition; see also April 6, 2000 PCR transcript at
15:20-16:2).  The State also contended that petitioner waited
almost ten years to bring his claims before the PCR court, well
beyond the five-year bar under Rule 3:22-12.  (Id.)  This Court
finds that there was no dilatoriness on petitioner's part.  He
raised his claims on direct appeal promptly, and after his case
was remanded and the confession was found to have been
constitutionally obtained, petitioner promptly appealed that
decision too.  Believing that he had fairly presented all of his
claims through the various stages of direct review, Ukawabutu
then proceeded to federal court.  The State misled petitioner
when it argued on the the first federal habeas petition that it
was not fully exhausted, and then asserted on state PCR review
that some of the very same claims were procedurally barred
because they had been raised on direct review by petitioner
previously.  The State should not be permitted to benefit from
its inconsistent contentions to the detriment of petitioner
obtaining federal habeas review now, especially after review was
precluded on petitioner's first habeas action.

    While this Court recognizes that equitable tolling must be
limited to truly "extraordinary" circumstances, the Third Circuit
has expressly found such circumstances when a petitioner is
placed in a procedural "Catch-22" situation by dismissal at the
federal level for failure to exhaust a claim that had already
been presented for state court review and thus subjecting
petitioner to a subsequent procedural bar at the state level.
See Brinson, 398 F.3d at 231-32.  In Brinson, the district court
had dismissed the first federal habeas petition, as a mixed
petition, because Brinson had brought forth evidence the court
believed ought to be viewed by the state court, even though the
evidence related to petitioner's Batson v. Kentucky, 476 U.S. 79
(1986) claim that had been presented on direct and collateral
state court review and would have been subject to procedural
default in state court if Brinson returned to state court as

398 F.3d 225, 230-32 (3d Cir. 2005); <u>Graf v. Moore</u>, 214 Fed.
Appx. 253 (3d Cir. Jan. 30, 2007).  It may certainly be argued
that Ukawabutu timely asserted his rights in the wrong forum, <u>see</u>
<u>Jones</u>, 195 F.3d at 159, when he filed his § 2254 before
attempting to exhaust his claims on state collateral review.  It
also may be argued that petitioner was diligent in 1997 and
through July 1999 in pursuing his claims, albeit in the wrong
forum.  Further, as more fully detailed in footnote 9 herein, the
mistaken dismissal of Ukawabutu's first federal habeas petition

_____

directed by the district court's dismissal of the federal habeas
petition.  The Third Circuit found that the district court's
mistaken dismissal of Brinson's first federal habeas petition
prevented Brinson "in a sufficiently extraordinary way from
asserting his rights under the federal habeas statute." <u>Id</u>. at
231.  It was not until after Brinson returned to state court to
find his petition procedurally barred, that the district court
ultimately recognized that Brinson had fully exhausted his
<u>Brinson</u> claim.  Even though the Commonwealth had argued on the
second federal habeas petition that Brinson did not act with
reasonable diligence, the Third Circuit observed the state's
argument to be flawed because Brinson had fully exhausted his
claim and therefore had no obligation to return to state court at
all.  <u>Id</u>. at 232.

     This Court acknowledges that the equitable tolling allowed
in <u>Brinson</u> (and in <u>Graf</u>) is based on a very narrow exception
where a court has misled a party regarding steps that the party
needs to take to preserve a claim.  <u>Brinson</u>, 398 F.3d at 230;
<u>Graf</u>, 214 Fed. Appx. at 256-58.  The facts in this case are
similar, but more compelling, because not only was the first
federal habeas petition dismissed by the district court on the
mistaken belief that Ukawabutu's claims were not fully exhausted,
but the court reached that determination based on the State's
misleading argument that petitioner's claims were not exhausted.
As noted above, Ukawabutu's prompt and diligent return to state
court was met with a procedural bar because the State advanced
the inconsistent argument that these claims already had been
raised.

for non-exhaustion prevented Ukawabutu "in a sufficiently
extraordinary way from asserting his rights under [§ 2254]," and
relegated Ukawabutu to another round of state court litigation
that was bound to fail on procedural default grounds, especially
where the State argued that petitioner's claims were procedurally
barred.  See Brinson, 398 F.3d at 231.  The State's inconsistent
positions in federal court and state court, and the mistaken
dismissal of the first federal habeas petition for the purpose of
enabling Ukawabutu to preserve his claims, misled Ukawabutu to
seek a round of futile state court litigation that jeopardized
subsequent federal habeas relief, which would be rendered
untimely because, by law, there was no statutory tolling during
the period Ukawabutu's first timely federal habeas petition was
pending.

Thus, the Court will grant equitable tolling of the
limitations period from the date Ukawabutu filed his first habeas
petition, on April 18, 1997, until August 2, 1999, when the
federal district court denied reconsideration respecting the
dismissal of the federal habeas petition on non-exhaustion
grounds.  At that point, the limitations period began to run
again, until Ukawabutu filed his state PCR petition, which was
before August 2, 1999, on July 16, 1999.  Upon the filing of his
state PCR petition, the limitations period was statutorily tolled
pursuant to 28 U.S.C. § 2244(d)(2), until May 8, 2003, when the

Supreme Court of New Jersey denied certification on Ukawabutu's appeal from denial of his state PCR petition.

On May 8, 2003, Ukawabutu had 6 days remaining on his one-year limitations period within which to filed his federal habeas petition.  In other words, he had until May 14, 2003 to file his habeas petition.  However, this Court finds that statutory tolling continued with respect to Ukawabutu's case because he had filed a motion for a new trial based on newly discovered evidence, on February 5, 2003, before the May 14, 2003 deadline.  That state court motion remained pending until the New Jersey Supreme Court denied certification on Ukawabutu's appeal from denial of his motion for a new trial on March 23, 2006.  Thus, Ukawabutu timely filed this habeas petition on February 17, 2006.

The State contends that a motion for a new trial does not constitute an application for collateral review for purposes of tolling under 28 U.S.C. § 2244(d)(2); therefore, Ukawabutu's habeas petition is time-barred.  However, the United States Court of Appeals for the Third Circuit has adopted a flexible approach in determining whether a motion may be equivalent to an application for collateral review under § 2244(d)(2), given that there are various forms of state review that are not necessarily pure post-conviction relief actions, "but are nonetheless related to collateral review."  Nara v. Frank, 264 F.3d 310, 315 (3d Cir. 2001); Jones, 195 F.3d at 159.

19

Because the state court reviewed Ukawabutu's motion for a new trial, and did not dismiss it solely on procedural grounds, this Court finds that petitioner's state court motion for a new trial constituted state collateral review for purposes of statutory toling under § 2244(d)(2).  Therefore, this Court rejects the State's affirmative defense that this action is time-barred under 28 U.S.C. § 2244(d), and will turn to review the merits of the petition.

IV.  <u>PROCEDURAL DEFAULT DOCTRINE</u>

_____Here, the State does not argue that Ukawabutu's petition is unexhausted, or "mixed" with unexhausted and exhausted claims. Rather, the State contends that petitioner's claims A, C, E, F, I and J are procedurally defaulted because said claims were denied by the state court on procedural grounds.[10]

The exhaustion and procedural default doctrines are often confused because they operate in tandem to protect the integrity

---

[10]  Claim A asserts that Ukawabutu's statements were obtained pursuant to an illegal arrest, in violation of the Fourth Amendment.  Claim C alleges that the trial court was incorrect in denying petitioner's claim that the State prosecutor failed to correct false gang evidence presented in the new suppression hearing on remand.  Claim E asserts that the state court erred in denying petitioner's claim of ineffective assistance of counsel.  Claim F asserts that the police failed to scrupulously honor petitioner's right to silence, in violation of the Fifth Amendment.  Claim I alleges a Sixth Amendment violation when the trial court used an out-of-court hearsay statement of a non-testifying witness.  Finally, Claim J asserts that petitioner's statements given during police interrogation were involuntary.

and independence of state judicial systems.  Under the exhaustion doctrine, a federal court shall not *grant* a writ of habeas corpus on behalf of an individual in custody pursuant to a state court judgment unless "the applicant has exhausted the remedies available in the state courts."  28 U.S.C. § 2254(b)(1).  In order to exhaust state court remedies, a habeas petitioner must show that he "fairly presented" his claims to the state courts by "invoking one complete round of the State's established appellate review process."  Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002)[11] (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999)).[12]

If a habeas petitioner has not "fairly presented" his claims to the state courts and it is still possible for him to raise those claims in a state court proceeding, the claim is unexhausted.  See, e.g., 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he

---

[11]   In Carpenter, the court applied the pre-AEDPA version of § 2254 because Carpenter filed his habeas petition before AEDPA went into effect.  Carpenter, 296 F.3d at 149 n.12.  This does not affect the court's discussion of the exhaustion and procedural default doctrines as they relate to this matter.

[12]   This Court is satisfied, based on review of the state court record, that the claims asserted in the habeas petition were fully exhausted on state court review.  Further, this Court notes that the State has failed to assert that any of the claims were not exhausted by Ukawabutu during state court review proceedings.

has the right under the law of the State to raise, by any available procedure, the question presented.").  However, if the state law clearly forecloses review of a claim which has not been fairly presented to the state courts, a federal court entertaining a habeas petition will hear the claim despite petitioner's failure to fairly present the claim in state court, unless the claim is procedurally defaulted.  See 28 U.S.C. § 2254(b)(1)(B)(I); Carpenter, 296 F.3d at 146.

A procedural default occurs when a habeas petitioner's federal claim is "barred from consideration in the state courts by an 'independent and adequate' state procedural rule."  See, e.g., Carpenter, 296 F.3d at 146; Doctor v. Walters, 96 F.3d 675, 683 (3d Cir. 1996).  On habeas review of state prisoner claims, a federal court "will presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'"  Coleman v. Thompson, 501 U.S. 722, 734-35 (1991)(quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)); see also Harris v. Reed, 489 U.S. 255, 266 (1989) (holding that habeas claim was not procedurally defaulted where state court did not clearly and expressly rely on procedural bar

22

as ground for rejecting the claim).[13]  Only a "firmly established and regularly followed state practice" is adequate to prevent subsequent habeas review in federal court.  <u>James v. Kentucky</u>, 466 U.S. 341, 348-351 (1984).  <u>See also</u> <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002) ("Ordinarily, violation of 'firmly established and regularly followed' state rules ... will be adequate to foreclose review of a federal claim." (citations omitted)).  Generally speaking, "[a] state court's refusal to address a prisoner's federal claims because he has not met a state procedural requirement is both independent and adequate."  <u>Cabrera v. Barbo</u>, 175 F.3d 307, 312 (3d Cir. 1999) (citations omitted).

     Finally, if it is determined that a claim is procedurally defaulted, a federal court may only entertain such claim on habeas review if the petitioner shows either cause to excuse the default and prejudice resulting from the default or that a fundamental miscarriage of justice will result should the federal court fail to hear petitioner's claim.  <u>See, e.g.</u>, <u>Coleman</u>, 501 U.S. at 750.

     The "cause" standard requires a petitioner to show that some objective factor external to the defense impeded his efforts to

---

[13] A state court's reliance on a procedural bar as an alternate holding is sufficient to trigger the "cause" and "prejudice" test.  <u>See</u> <u>United States ex rel. Caruso v. Zelinsky</u>, 689 F.2d 435, 440 (3d Cir. 1982).

comply with the state procedural rule.  See Coleman, 501 U.S. at 752 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)).  In the absence of a Sixth Amendment violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation.  Coleman, 501 U.S. at 754.  Neither a pro se prisoner's ignorance of the procedural rule nor inadvertence satisfies the cause standard.  Murray at 485-87.  Failure of the state court to "bend the rules" for a pro se litigant is not cause.  Caswell v. Ryan, 953 F.2d 853, 862 (3d Cir. 1992).

To establish "prejudice," a petitioner must prove "'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension.'"  Murray v. Carrier, 477 U.S. 478, 494 (1986) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).  In the context of an ineffective assistance claim, the Court of Appeals for the Third Circuit has held that prejudice occurs where "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different."  Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996).

In the alternative, in order to establish that failure to review an otherwise procedurally defaulted claim will result in a "miscarriage of justice," a petitioner must show that "a

constitutional violation has probably resulted in the conviction of one who is actually innocent." Carrier, 477 U.S. at 496. "Thus, to establish a miscarriage of justice, the petitioner must prove that it is more likely than not that no reasonable juror would have convicted him." Werts, 228 F.3d at 193 (citing Schlup v. Delo, 513 U.S. 298, 326 (1995)).

Here, the Court finds that the claims A, C, F, I and J are not procedurally defaulted, as asserted by the State.  These claims were raised in Ukawabutu's first pro se brief in support of his state PCR petition as Points I, II, III, VI, V and VI. The New Jersey Appellate Division held, in its October 3, 2002 Opinion on state PCR review, that:

> Judge Neustadter, in a thorough and comprehensive opinion, addressed each of the foregoing issues and rejected them. In short, he determined that the issues could be decided without the need for an evidentiary hearing, that the issues raised in Points One through Six of the pro se brief were procedurally barred because they were addressed by this court in the earlier appeal or, because they are issues that could have been raised in the earlier direct appeal filed by the defendant. ...
>
> Respecting Point One of the brief filed by counsel for the appellant and the appellant's own pro se brief, namely that the PCR court erred in concluding that Points One through Six of the pro se brief were procedurally barred, we have carefully reviewed the record and find this argument to be without merit.  R. 2:11-3(e)(2).  Not only is it true that the applicable rule bars the inclusion in a petition for PCR of any matter or issue that could have been raised in the direct appeal, R. 3:22-4, but the record in this matter makes abundantly clear that the very issues raised in these points were in fact raised as a part of the direct appeal, were considered and were rejected by this court.  See State v. Jackson, supra, 272 N.J. Super. at 547.  Therefore, they are barred for that reason as well.  R. 3:22-5.  The essence

of Jackson's argument here is that in the direct appeal the
court erred in remanding the <u>Miranda</u> claim for an
evidentiary hearing and that it should instead have simply
agreed with his overall analysis, resulting in a reversal of
his conviction.  That claim, however, whether analyzed as a
Fourth, Fifth or Sixth Amendment claim, was included in the
original direct appeal and specifically referred to in this
court's published decision which remanded the matter for a
hearing.  As such, it has been considered and rejected as a
part of the direct appeal and is now barred.  <u>See</u> <u>State v.
McQuaid</u>, 147 N.J. 464, 484 (1997); <u>cf</u>. <u>Robinson-Shore
Development Co. V. Gallagher</u>, 26 N.J. 59, 74-75 (1958).

(New Jersey Appellate Division Opinion, dated October 3, 2002).

Thus, the trial judge and the appellate court make
abundantly clear that petitioner's claims One through Six were
procedurally barred under N.J. Court R. 3:22-5[14] because these
claims had been presented for state court review on direct
appeal.  The state court did not apply the procedural bar under
N.J. Court R. 3:22-4[15] in its ruling.  Consequently, the Court

---

[14]  New Jersey Court Rule 3:22-5 provides:
      A prior adjudication upon the merits of any ground for
      relief is conclusive whether made in the proceedings
      resulting in the conviction or in any post-conviction
      proceeding brought pursuant to this rule or prior to
      the adoption thereof, or in any appeal taken from such
      proceedings.

[15]  New Jersey Court Rule 3:22-4 provides:
      Any ground for relief not raised in a prior
      proceeding under this rule, or in the proceedings
      resulting in the conviction, or in a post-conviction
      proceeding brought and decided prior to the adoption of
      this rule, or in any appeal taken in any such
      proceedings is barred from assertion in a proceeding
      under this rule unless the court on motion or at the
      hearing finds (a) that the ground for relief not
      previously asserted could not reasonably have been
      raised in any prior proceed; or (b) that enforcement of

finds that these claims were fully exhausted on direct appeal, and therefore, are not procedurally defaulted to preclude federal habeas review.

Ukawabutu contests the State's affirmative defense that these claims are procedurally defaulted.  He acknowledges that the state PCR court had ruled these claims were raised on direct appeal and rejected.[16]  However, Ukawabutu states that he was forced to re-litigate these claims in his state PCR proceedings because the State had misled him and the District Court in his first federal habeas action to believe that these claims had not been presented for state court review.  Thus, Ukawabutu returned to state court and re-litigated these claims, as well as his ineffective assistance of counsel claims, which had not been presented for state court review previously.  See Petitioner's Objections, Docket Entry No. 21, at pp. XVIII-XXII.

_____

the bar would result in fundamental injustice; or (c) that denial of relief would be contrary to the Constitution of the United States or the State of New Jersey.

[16]  Ukawabutu argues that Ground E, asserting claims of ineffective assistance of counsel, was reviewed by the PCR court and was not found procedurally barred.  He also contends that Ground C, based on newly discovered evidence, was not raised in his PCR proceedings, and that this claim was the basis of his motion for a new trial.  This Court finds that these claims were fully exhausted on the merits in state court, and thus, are not procedurally defaulted.

27

Based on review of the state court record, and for the reasons set forth above, this Court finds that Claims A, C, F, I and J of Ukawabutu's habeas petition are not procedurally defaulted because these claims were presented and fully exhausted on state court review, most notably on direct appeal.  Further, Claim E, which asserts ineffective assistance of counsel claims, was reviewed on the merits in petitioner's state PCR proceedings, and therefore, is not procedurally defaulted.  Having determined that petitioner's claims were exhausted on state court review, and are not procedurally defaulted, the Court now turns to review the merits of Ukawabutu's habeas petition.

IV.   <u>STANDARD OF REVIEW</u>

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  <u>See Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).  Because petitioner is a <u>pro se</u> litigant, the Court will accord his petition the liberal construction intended for <u>pro se</u> petitioners.

28

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may only intervene to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable." Engle v. Isaac, 456 U.S. 107, 120 n. 19 (1982). Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, __, 126 S.Ct. 602, 604 (2005).

Section 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), limits a federal court's authority to grant relief when a state court has adjudicated a petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). Moreover, federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts. See 28 U.S.C. § 2254(e); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122 S.Ct. 269 (2001);

<u>Dickerson v. Vaughn</u>, 90 F.3d 87, 90 (3d Cir. 1996)(*citing* <u>Parke v. Raley</u>, 506 U.S. 20, 36 (1992)).

Section 2254(d) sets the standard for granting or denying a habeas writ:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court explained that subsection (d)(1) involves two clauses or conditions, one of which must be satisfied before a writ may issue.  The first clause, or condition, is referred to as the "contrary to" clause.  The second condition is the "unreasonable application" clause.  <u>Williams</u>, 529 U.S. at 412-13.  In the "contrary to" clause, "a federal court may grant the writ if the state arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides

30

a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. Under the "unreasonable application" clause, a federal court may grant the writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case." Id. at 413. Habeas relief may not be granted under the "unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief. Id. at 411. See also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999), cert. denied sub nom Matteo v. Brennan, 528 U.S. 824 (1999).

Consonant with Williams, the Third Circuit has held that § 2254(d)(1) requires a federal habeas court to make a two step inquiry of the petitioner's claims. First, the court must examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims. See Werts, 228 F.3d at 196-97; Matteo, 171 F.3d at 888-891. If the federal court determines that the state court's decision was not "contrary to" applicable Supreme Court precedent, then the court takes the second step of

the analysis under § 2254(d)(1), which is whether the state court unreasonably applied the Supreme Court precedent in reaching its decision.  <u>Werts</u>, 228 F.3d at 197.

This second step requires more than a disagreement with the state court's ruling because the Supreme Court would have reached a different result.  <u>Id</u>.  AEDPA prohibits such *de novo* review.  Rather, the federal habeas court must determine whether the state court's application of the Supreme Court precedent was objectively unreasonable.  <u>Id</u>.  In short, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  <u>Id</u>.; <u>see also</u> <u>Jacobs v. Horn</u>, 395 F.3d 92, 100 (3d Cir. 2005).

The unreasonableness standards of § 2254(d), as set forth above, govern only claims that were "adjudicated on the merits in State Court proceedings."  28 U.S.C. § 2254(d).  "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."  <u>Rompilla v. Horn</u>, 355 F.3d 233, 247 (3d Cir. 2004)(citations and internal quotation marks omitted), <u>reversed on other grounds sub nom. Rompilla v. Beard</u>, 545 U.S. 374 (2005); <u>see also</u> <u>Rolan v. Vaughn</u>,

32

445 F.3d 671, 678 (3d Cir. 2006)("here, because the PCRA appellate court found that Vargas was not willing to testify at the guilt phase of Rolan's trial, its decision to deny habeas relief on that basis constituted an adjudication on the merits").

Thus, even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538 U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). On the other hand, with respect to legal claims presented to, but not addressed or adjudicated by, the state courts, § 2254(d) does not apply, and a federal court may undertake de novo review of the claims and exercise pre-AEDPA independent judgment. See Rolan, 355 F.3d at 247; Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence. See Duncan, 256 F.3d at 196 (citing 28

33

U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

V.  ANALYSIS

The Court will examine each of petitioner's claims on the merits, pursuant to the standard of review as recited above.

A.  Fourth Amendment Claim

In Ground One (Claim A), Ukawabutu asserts that his statements given to the police during interrogation were obtained in violation of the Fourth Amendment.  This claim was raised on direct appeal, but Ukawabutu claims that the state court did not expressly adjudicate the Fourth Amendment issue.[17]

Ukawabutu alleges that, on July 11, 1989, he was arrested at his home at 6:30 a.m., without a warrant or probable cause,

_____

[17]  In its decision on direct appeal, in which a remand was ordered for an evidentiary hearing on the admissibility of petitioner's oral and taped statements to the police, the New Jersey Appellate Division expressly noted petitioner's pro se brief asserting a Fourth Amendment claim regarding the statements to police in Point I of the pro se brief.  See State v. Jackson, 272 N.J. Super. 543, 547 (App. Div. 1994).  While there was no explicit discussion of the claim, the appellate court in remanding the Miranda claim for a new suppression hearing stated that if the trial court determined that the confession was admissible, then petitioner's conviction would be affirmed, leaving the court to determine only the excessive sentencing claim.  Thus, this Court concludes that the Appellate Division rejected the Fourth Amendment claim without discussion.

34

pursuant to a "plan" devised by Investigator Folks. Ukawabutu
was taken to the Major Crimes Squad Unit ("MCS Unit") at the
police station involuntarily and interrogated in violation of the
Fourth Amendment. Ukawabutu further alleges that he had asked
several times about going home, but was told by Investigator
Folks he could go home if petitioner relayed what happened
concerning the death of Jessie Rice. Ukawabutu maintains that he
eventually gave the statements to the police because he was hot,
very tired, and different officers kept coming in and going out
of the interrogation room telling him what he was supposed to
have done. He felt the only way to go home was to tell the
police what they kept saying had happened. Ukawabutu claims
that, as a result of this illegal arrest and detention, two
statements were obtained by the police in violation of the Fourth
Amendment.

The trial court had concluded during the initial <u>Miranda</u>[18]
hearing that Ukawabutu was "in custody" at the time of his
interrogation, even though he was not formally arrested, finding
that petitioner did not believe he had a right not to go to the
police station or that he could leave when he wanted. (2T 126:7-
14). However, the New Jersey Appellate Division found that
Ukawabutu's statement to police was not coerced. <u>State v.
Jackson</u>, 272 N.J. Super. at 869.

---

[18]   <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Ukawabutu's Fourth Amendment claim must be assessed by reference to the Supreme Court's decision in <u>Stone v. Powell</u>, 428 U.S. 465 (1976), which precludes habeas review of Fourth Amendment claims that have been litigated in state court.

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal and the substantial societal costs of application of the rule persist with special force.

<u>Stone v. Powell</u>, 428 U.S. at 494-95. However, if the state does not provide any corrective process to redress alleged Fourth Amendment violations, or where the state does offer a corrective process and defendant is precluded from using it, federal habeas review may be warranted. <u>Gates v. Henderson</u>, 568 F.2d 830, 840 (2d Cir. 1977), <u>cert</u>. <u>denied</u>, 434 U.S. 1038 (1978).

Here, it would appear that petitioner did raise this Fourth Amendment claim on direct appeal in state court. Indeed the Appellate Division noted petitioner's Fourth Amendment argument. While the court did not expressly reject, it is clear from the circumstances that the court considered it meritless. The court remanded only the <u>Miranda</u> claim for a new suppression hearing, and stated that if the trial court found the confession admissible, then the conviction would be affirmed. Thus, it is

36

fair to say that petitioner's Fourth Amendment claim was considered and rejected and therefore fully and fairly litigated at that stage of the appeal process.  Accordingly, habeas review now would be precluded under Stone v. Powell.

Nevertheless, Ukawabutu continued to press this Fourth Amendment claim at each level of direct and collateral review in state court, without any success or discussion, because he believed the issue was never addressed.  Assuming arguendo that petitioner's Fourth Amendment claim is not precluded from habeas review under Stone v. Powell because it was never litigated, this Court also finds that the claim lacks merit.

In determining the merit of this claim, there is no reason to conduct an evidentiary hearing on the matter because the investigators' testimony at both suppression hearings and petitioner's testimony at the first suppression hearing are sufficient in relating the facts necessary in making a determination on any purported Fourth Amendment violation.

The Fourth Amendment is applicable to the States through the Fourteenth Amendment.  A seizure of a person within the meaning of the Fourth Amendment occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"  Kaupp v. Texas, 538 U.S. 626, 629 (2003)(quoting

Florida v. Bostick, 501 U.S. 429, 437 (1991) and Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).  The Supreme Court has articulated several examples of circumstances that might indicate a seizure under the Fourth Amendment, even where the person did not attempt to leave, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  Kaupp 538 U.S. at 630 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

In Kaupp, the Supreme Court observed that while certain seizures may be justified on something less than probable cause as enunciated in Terry v. Ohio, 392 U.S. 1 (1968), "we have never 'sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes ... absent probable cause or judicial authorization.'" Kaupp, supra (quoting Hayes v. Florida, 470 U.S. 811, 815 (1985)).  Thus, "involuntary transport to a police station for questioning is "sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause." Id. (quoting Hayes, 470 U.S. at 816).

In Brown v. Illinois, 422 U.S. 590 (1975), the Supreme Court held that a confession obtained through custodial interrogation

38

after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is "sufficiently an act of free will to purge the primary taint" of the illegal arrest.  422 U.S. at 602.   The Court observed that:

> [i]f Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted.  See Davis v. Mississippi, 394 U.S. 721, 726-727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969).  Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving Miranda warnings.  Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.'  See Mapp v. Ohio, 367 U.S. [643] at 648, 81 S.Ct. [1684] at 1687.

Brown, 422 U.S. at 602-03.

The Court further held that the giving of Miranda warnings, although an important factor, is not the only factor to be considered in determining whether the confession was obtained by exploitation of an illegal arrest.  The voluntariness of the statement is a threshold requirement, but the court must consider the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the "purpose and flagrancy of the official misconduct."  Brown, 422 U.S. at 603-04.

Similarly, the Supreme Court held in <u>Dunaway v. New York</u>, 442 U.S. 200 (1979):

> "[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment.  Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" [<u>Davis v. Mississippi</u>, 394 U.S. 721, 726-27 (1969)].
>
> . . .
>
> <u>Brown v. Illinois</u>, [422 U.S. 590 (1975)], similarly disapproved arrests made for "investigatory" purposes on less than probable cause.  Although Brown's arrest had more of the trappings of a technical formal arrest than petitioner's, such differences in form must not be exalted over substance.  Once in the police station, Brown was taken to an interrogation room, and his experience was indistinguishable from petitioner's.  Our condemnation of the police conduct in <u>Brown</u> fits equally the police conduct in this case:
>
>> "The impropriety of the arrest was obvious; awareness of the fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' ...  The arrest, both in design and in execution, was investigatory.  The detectives embarked upon this expedition for evidence in the hope that something might turn up." [<u>Brown v. Illinois</u>, 422 U.S. at 605].
>
> These passages from <u>Davis</u> and <u>Brown</u> reflect the conclusion that detention for custodial interrogation - regardless of its label - intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest.

<u>Dunaway v. New York</u>, 442 U.S. 200, 215-16 (1979).

40

In yet another case, Taylor v. Alabama, 457 U.S. 687 (1982), the Supreme Court held that a confession obtained through a custodial interrogation of the petitioner after he had been illegally arrested without a warrant or probable cause should have been suppressed.  The Court found that the intervening events did not break the causal connection between the arrest and the confession.  Specifically, the Court rejected the State's argument that petitioner had been given Miranda warnings three times, based on its rulings in Brown and Dunaway.  The Court also found that the six hours between petitioner's arrest and confession and his visit with his girlfriend and male companion for five to ten minutes outside the interrogation room was not sufficient to constitute an intervening event that would have contributed to petitioner's ability to objectively consider his options and exercise his free will in giving a confession.  Further, the fact that an arrest warrant was filed, based on a comparison of fingerprints, did not remove the taint because the initial fingerprints were themselves the fruit of the illegal arrest and were used to extract the confession.  Finally, the Court found that the lack of flagrant or purposeful police conduct did not cure the illegality of the initial arrest.  The Supreme Court expressly declined to adopt a "good faith" exception to the exclusionary rule.  Taylor, 457 U.S. at 691-93.

In this case, it is questionable whether petitioner's custodial interrogations constituted a seizure without probable cause.[19]  The state courts found that petitioner did not believe that he had a right to leave the interrogation, suggesting that petitioner was in police custody but not formally arrested. However, the seizure by police was based on a reliable informant's statement that petitioner was involved in the Rice murder.  Police investigation reports confirm that the police had information from various sources before July 11, 1989, that petitioner was involved in the murder of Rice.  (Ra1571-1595). This information appears sufficient to satisfy probable cause for bringing petitioner for questioning.

At the second interrogation, which resulted in Ukawabutu's confession, the police had the statements of Terry Bailey and Darryl Welch, who themselves admitted to being involved in the robbery of Rice, saying that petitioner had committed the murder.

---

[19]  This Court reiterates the factual background regarding Ukawabutu's interrogations.  "On July 11, 1989, at 6:30 a.m., [petitioner, Welsh and Bailey were] brought to police headquarters for questioning.  Each man denied involvement in the homicide and sometime after 1:00 p.m. they were separately released.  That afternoon, Bailey gave incriminating information to the police which was then confirmed by Welch.  At approximately 6:00 p.m. [twelve hours later], [petitioner]was brought back to police headquarters and during the ensuing interview, taped statements of Bailey and Welch were played for defendant.  Bailey and Welch were also brought into the interview area.  They talked and argued with defendant.  Ultimately, defendant admitted he shot Rice.  He then proceeded to provide a detailed confession."  State v.  Jackson, 272 N.J. Super. At 547

This clearly would suffice for probable cause to arrest petitioner.  Consequently, this Court finds that the police had probable cause to detain and question petitioner under these circumstances.

Nevertheless, this Court does not need to reach the issue of whether Ukawabutu's seizure for questioning on July 11, 1989 was without probable cause because the Court ultimately decides this case on attenuation grounds.  In this regard, the relevant constitutional question becomes "whether the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint."  United States v. Ceccolini, 435 U.S. 268, 273-74 (1978).

As set forth above, the Supreme Court delineated four factors relevant to an attenuation analysis: (1) the administration of Miranda warnings; (2) "[t]he temporal proximity of the arrest and the confession; (3) "the presence of intervening circumstances"; and (4) "particularly, the purpose and flagrancy of the official misconduct."  Brown, 422 U.S. at 603-04.

Here, the police administered Miranda warnings several times.  There also is no evidence that the police conducted the interrogation in an unconstitutional manner.  The police did not physically abuse petitioner and allowed him to use the bathroom and offered him food and drinks during the interrogation process

43

(although petitioner declined the offerings).  There was a significant gap in time from when Ukawabutu was first taken into custody for interrogation at around 6:30 a.m. on July 11, 1989 until he gave his confession at about 6:15 p.m.  (A difference of about 12 hours).  In between that time, Ukawabutu had been released and allowed to go to his girlfriend's house.  Petitioner brought his girlfriend with him to the MCS Unit the second time, and she was permitted to stay outside the interrogation room and he was allowed to see her.

Therefore, this Court finds that any taint from the seizure of petitioner for questioning was sufficiently purged based on the factors as discussed above.  The Fourth Amendment claim is without merit and will be denied.

B.  <u>Waiver of Jury Trial</u>

In Ground Eight of his petition, Ukawabutu alleges that he did not knowingly and intelligently waive his right to a jury trial.  Petitioner argues that there was no meaningful colloquy between the trial judge and petitioner to discern whether Ukawabutu understood the significance of the constitutional right to a jury trial, and the advantages and disadvantages of waiving the right to a jury trial in a capital case.  Ukawabutu also alleges that his initial lead attorney, Michael Preston, Esq., had set the stage for a jury trial by filing numerous motions pertaining to a jury trial.  However, after Mr. Preston withdrew from the case, defense counsel on the penalty phase, Kevin P. Lewis, Esq., moved up to handle the entire case, over Ukawabutu's objections, and waived petitioner's right to a jury trial. (Petition at pp. 35-36).

The state court record reflects that, on March 22, 1991, Ukawabutu appeared in court with two attorneys, Mr. Lewis and Charles Jurman, and in the presence of the prosecutor.  (T1, 3:17-19).  The following colloquy occurred:

> THE COURT: Shawn Jackson.  All right, Mr. Lewis.
> MR. LEWIS: Thank you, Your Honor.  This is Shawn Jackson, Your Honor, who is on your list for trial now scheduled for May 14th of 1991.  I have discussed with Mr. Jackson his options with regard to trial, whether it be by jury or by a bench trial before the Judge alone.  After having gone over this matter with Mr. Jackson, we have executed a request to be tried by the Judge and hereby waive the jury application.

45

THE COURT: Mr. Rosenfeld.

MR. ROSENFELD: Yes, as Your Honor knows, we do consent to this waiver.  However, with respect to the form that's been submitted to Your Honor, I note that it does not contain an indictment number.  I would suggest that at the top in the caption that that should appear.

THE COURT: All right.  What number is it?

MR. LEWIS: We'll get you that number, Judge.  I'll provide that.

(T1, 2:1-4:1).

After the trial court confirmed that the prosecutor had consented to the jury waiver, the judge spoke to Ukawabutu:

BY THE COURT:

Q.   You're Shawn Jackson?

A.   Yes.

Q.   How old are you, Mr. Jackson?

A.   Twenty-one.

Q.   Your lawyer has told me that you want to waive a trial by jury in the murder charges which is a capital case, as you know, and that you want to be tried by the Court without a jury both as to the guilt phase and the penalty phase if you're found guilty.  Is it true that you want to waive a jury trial?

A.   Yes.

Q.   And have you signed this form here?  Is this your signature?

A.   Yes.

Q.   You signed this in court today?

A.   Yes.

Q.   All right.

THE COURT: The Court is satisfied that Mr. Jackson represented by competent counsel in the person of Kevin Lewis and Charles Jurman.  He understands his rights.  He understands his rights to be tried by a jury.  He waives that right, has executed a waiver in writing.

(T1 2:24-3:21).

46

The State argues that petitioner's waiver of a jury trial conformed in all respects to state court rule and statute and that the oral and written waiver amply demonstrated that Ukawabutu's waiver was knowing and intelligent.

The right of a criminal defendant to be tried by a jury of his peers is a fundamental constitutional guarantee.  Duncan v. Louisiana, 391 U.S. 145 (1968).  Such right can be waived only by a defendant's "express and intelligent consent," and the agreement of both the government and the court.  Schneckloth v. Bustamonte, 412 U.S. 218, 237 (1973)(citing Adams v. United States ex rel. McCann, 317 U.S. 269, 277-78 (1949))(defendant's waiver of a jury trial must be express, intelligent and competent).

Whether a waiver is knowing and competent depends upon whether the totality of the circumstances supports that conclusion.  Adams, 317 U.S. at 278.  Representation by counsel is relevant in determining whether a defendant's waiver of a jury trial was knowing.  United States ex rel. Williams v. DeRobertis, 715 F.2d 1174, 1175 (7th Cir. 1983), cert. denied 464 U.S. 1072 (1984).

The Federal Rules of Criminal Procedure require that the right to a jury trial be waived explicitly in writing. Fed.R.Crim.P. 23(a).  No reference is made to oral colloquy. Compliance with this rule's written waiver requirement "'creates a presumption that the waiver is a voluntary, knowing and

47

intelligent one.'" <u>United States v. Sammons</u>, 918 F.2d 592, 597 (9th Cir. 1990)(quoting <u>United States v. Cochran</u>, 770 F.2d 850, 851 (9th Cir. 1985)).  Thus, under federal law, a defendant who has waived his right to a jury trial bears the burden of "plain[ly] showing that such waiver was not freely and intelligently made."  <u>Adams</u>, 317 U.S. at 281.

While there is no constitutional requirement that a court conduct a colloquy on the record with a defendant who waives his right to a jury trial, a district court typically will conduct such a colloquy to ascertain whether the defendant fully understands the nature of the right being relinquished and the implications of that decision.  The United States Court of Appeals for the Third Circuit has stated that the colloquy between the court and defendant is preferable to the mere acceptance of a written waiver because the colloquy serves two purposes.  First, it emphasizes for the defendant the seriousness of his decision to waive his right to be tried by a jury. Second, it creates a clear record of the waiver to establish that "express and intelligent consent" was given by defendant in waiving his right to a jury trial.  <u>United States v. Mitchell</u>, 427 F.2d 1280 (3d Cir. 1970).

New Jersey court rules also require that waiver of a jury trial be in writing.  <u>See</u> <u>Rule</u> 1:8-1(a).  <u>Rule</u> 1:8-1(a) provides:

> [c]riminal actions required to be tried by a jury shall be
> so tried unless the defendant, in writing, and with the
> approval of the court, after notice to the prosecuting

48

attorney and his opportunity to be heard, waives a jury
trial.
Additionally, <u>N.J.S.A.</u> 2C:11-3(c)(1) provides that "[o]n motion
of defendant and with consent of the prosecuting attorney, the
court may conduct a [death penalty phase] proceeding without a
jury."

Courts have held that a written jury trial waiver, such as
that required under <u>N.J.Ct.R.</u> 1:8-1(a) in this case, if validly
executed, cannot be attacked on appeal.

On direct appeal, the Appellate Division considered and
rejected Ukawabutu's claim that his jury trial waiver was not
knowing and intelligent.  The court recited the colloquy that
took place on March 22, 1991, and opined:

> It is clear from the colloquy between the court and counsel
> that defendant's waiver of a jury trial was in writing and
> was consented to by the State as is required by <u>N.J.S.A.</u>
> 2C:11-3c(1).  The transcript is devoid of any discussion
> between the court and defendant other than the court's
> inquiry as to the execution of the waiver form and the
> court's final inquiry as to whether defendant had any
> questions which he desired to direct to the court.

> In <u>State v. Wyman</u>, 232 N.J. Super. 565 (App. Div. 1989), we
> reversed a judgment of conviction under similar
> circumstances, although in <u>Wyman</u> the waiver was oral and not
> written as in the case <u>sub judice</u>.  In <u>Wyman</u>, as here, there
> was no express and understanding waiver by defendant of his
> right to trial by jury in open court.  It was our clear
> determination that a "defendant's mere acquiescence in
> proceeding without a jury" is not sufficient to constitute a
> waiver of the constitutional right to a jury trial.  <u>Id</u>. at
> 568.  We specifically provided:

>> We deem it important to emphasize that trial courts and
>> prosecutors should make certain that a waiver of a jury
>> trial be in writing and signed by the defendant as

required by R. 1:8-1(a), or that defendant personally place on the record in open court an express and understanding waiver of his or her right to such a trial.

[Ibid.  (emphasis added).]

Clearly our statement in Wyman implies that in requiring verbalization by a defendant, an "express and understanding waiver" is required where the waiver is not in writing. Confirmatory verbalization of a defendant's written waiver is not specifically mandated by R. 1:8-1(a).

(April 25, 1994 Appellate Division Opinion, Ra176-Ra177).

The court went on to discuss the law pertaining to the issue of a jury trial waiver, acknowledging the United States Supreme Court rulings in Schneckloth and Adams, supra.  The court noted that, under federal law, a "defendant who has waived his right to a jury trial bears the burden of 'plain[ly] showing that such waiver was not freely and intelligently made.'"  (April 25, 1994 Appellate Division Opinion at Ra178, citing Adams, 317 U.S. at 281).  The Appellate Division found:

Defendant has failed to present any evidence to support his argument that his jury trial waiver was other than a knowing and intelligent decision made by him with advice of counsel. Defendant has also not buttressed his argument with an affidavit or certification alleging facts to support his contention.

As noted, defendant's written waiver was executed and presented to the court on March 22, 1991.  Defendant's next court appearance was on May 14, 1991 on the day scheduled for trial.  The following colloquy occurred:

THE COURT: Good morning, ladies and gentlemen. Ladies and gentlemen, today is the scheduled date for the trial, non jury, of the matter of State versus

> Shawn Jackson.  This is a capital murder case, and the
> defendant previously waived a jury in writing and
> verbally.  I would want to confirm that that is still
> in effect.
>
> Mr. Lewis?
>
> MR. LEWIS: Thank you, your Honor.  I have again
> confirmed that with Mr. Jackson.  It is still in
> effect.  We would proceed as indicated earlier.
>
> THE COURT: Is that correct, sir?
>
> THE DEFENDANT: Yes.

> We are satisfied that if defendant had any second thoughts
> as to the propriety of his decision on March 22, 1991 to
> waive a jury trial, he had ample time between that date and
> the actual date of trial to move to retract his waiver, and
> most importantly, was given a specific opportunity to
> express his misgivings or even lack of consent on May 14,
> 1991.  He did not do so and we conclude that defendant's
> written waiver on March 22, 1991, executed in accordance
> with R. 1:8-1(a), was properly accepted by the trial judge.

(April 25, 1994 Appellate Division Opinion at Ra178-Ra179).

The Appellate Division further rejected petitioner's

argument that State v. Dunne, 124 N.J. 303 (1991) requires a

verbalized waiver of a jury trial in this instance.  The court

concluded that the Supreme Court of New Jersey in Dunne

> did not impose an affirmative obligation upon the trial
> court to require verbalization on the record by a defendant
> seeking to waive a trial by jury.  The Supreme Court could
> have, but did not, impose that requirement as an amendment
> to R. 1:801(a), nor did the Supreme Court retroactively
> apply its decision to encompass any written waiver accepted
> by a trial court in proceedings predating its decision.
> We conclude that the failure of the trial court here to
> elicit the information necessary to determine if defendant's

> waiver should be rejected in accordance with <u>State v.</u>
> <u>Fiorilla</u> [226 N.J. Super. 81, 92 (App. Div. 1988)], did not
> possess a clear capacity to produce an unjust result, <u>R.</u>
> 2:10-2, <u>see</u> <u>also</u> <u>State v. Macon</u>, 57 N.J. 325, 333-41 (1971),
> and defendant's challenge to his conviction on this ground
> is rejected.

(April 25, 1994 Appellate Division Opinion at Ra180-Ra181).

This Court finds no basis for Ukawabutu's claim that his
waiver of a jury trial was not knowingly and intelligently made.
The trial court expressly found that, while the colloquy between
petitioner and the court was relatively brief, Ukawabutu failed
to establish any facts that would indicate that he did not know
or understand what he was giving up.  Petitioner executed a
written waiver, and acknowledged that waiver in open court, not
once but twice.  In fact, the second confirmation of his waiver
of a jury trial came two months after the written waiver was
first confirmed on March 22, 1991 in open court, plenty of time
for petitioner to rescind his waiver if he had changed his mind
or was contemplating changing his mind.

Moreover, this Court finds that the trial court's decision
on this issue of the validity of the jury trial waiver was not
contrary to clearly established federal law, as set forth above;
nor did it involve an unreasonable application of clearly
established federal law.  Further, the state court rulings were
not based on an unreasonable determination of the facts.  <u>See</u> 28
U.S.C. § 2254(d).  The state court correctly identified and
applied the governing legal rule and reasonably determined the

52

applicable facts.  Accordingly, this claim for habeas relief will be denied for lack of merit.

C.  <u>Prosecutorial Misconduct Claim</u>

     In Ground Three of his petition, Ukawabutu asserts a claim of prosecutorial misconduct based on what he regards as false evidence of gang activity that was presented by the State during the suppression hearing on remand.  He alleges that, on September 14, 1994, during the remand hearing, former Prosecutor Steven Rosenfeld knowingly introduced "unfounded and false gang evidence" through the testimony of Investigators Folks and Juliano that the case was related to two gangs in the Atlantic City area.  Petitioner states that this was the first time this gang-related evidence was raised.

     In that hearing, both Folks and Juliano testified that they knew that the victim was a member of a gang called the Salaams, and the co-defendants, Welch and Bailey, were members of a rival gang called the Abdullahs.  Petitioner was not a member of either gang.  Both gangs allegedly were in a heated rivalry over drug trafficking, guns and retribution.  Folks and Juliano testified that this information was learned during their investigation of the murder and from intelligence reports.  They also stated that they never discussed anything about the gangs with each other or with petitioner.

     Ukawabutu contends that these detectives changed their testimony from the original suppression hearing to explain that

petitioner never invoked his right to remain silent, but rather, indicated that he was afraid to talk because someone might hurt him or his pregnant girlfriend.  Folks and Juliano testified at the remand hearing that they understood petitioner's statement to refer to the Abdullah gang.  The defense attorney objected to the prosecutor pursuing this line of questioning.

Thereafter, during his PCR proceedings, Ukawabutu filed motions to compel discovery of the investigation and intelligence reports concerning the gang activity introduced at the remand hearing.[20]  Petitioner alleges that the discovery was never provided, and he raised the issue again in an interlocutory appeal filed in January 2001, because his counsel on his PCR appeal failed to do so.  On February 15, 2001, the State filed a brief in opposition to the motion to compel, stating that the requested documents do not exist.[21]  The Appellate Division

_____

[20]  Ukawabutu states that he had requested his assigned counsel on appeal after the remand to obtain the investigation reports from the State, but counsel did not do so.

[21]  The letter from the Prosecutor's Office in response to the discovery motion before Judge Neustadter stated:  "A review of the files and the remand transcripts was undertaken.  The review of the remand hearing transcripts shows that no such reports ever existed.  Investigator Juliano unequivocally testified that there were no written reports.  He testified that the information regarding the gangs was given verbally.  More importantly the information was only for background.  As can easily be gleaned from the aforementioned facts the motive for the robbery was to get money.  Defendant's claim that there were written reports is unsubstantiated.  Moreover, there is not even any indication that the information alleged to exist would have any connection to the defendant's guilt or innocence or to any material claim that could amount to prejudice."  (Ra2051-Ra2052).

dismissed the interlocutory appeal without prejudice on February 28, 2001.

Ukawabutu raised this issue again in his appeal from denial of the PCR petition.  Specifically, petitioner asserted that "the prosecutor committed prosecutorial misconduct by knowingly withholding impeachment evidence and by knowingly using false and perjured testimony at the evidentiary hearing thus creating a Brady-Bagley[22] issue in violation of petitioner's Fifth and Fourteenth Amendment due process rights."  The Appellate Division found no merit to petitioner's claim, stating:

> Finally, by motion filed with this court, appellant has been permitted to argue that he was deprived of information in connection with the remanded proceedings that he requested in the nature of investigatory files or reports relating to gangland activity, an assertion in Point III of counsel's brief on appeal.  The essence of appellant's contention is that the trial court should have ordered the State to turn over investigative reports relating to gangland activity and that failure to do so amounts to a Brady/Bagley violation. [citations omitted].

> First, the issue of alleged gangland activity as it related to the investigation into this murder was known to appellant both at the time of his original trial and during the remand proceedings, as a result of which his failure to raise his allegation about withholding of discoverable evidence under the Brady/Bagley doctrine is procedurally barred.  R. 3:22-4.  Notwithstanding that bar, because we granted leave to raise the issue as a part of this PCR appeal, we briefly address its substance.  While defendant asserts that the investigators had information relating to possible gang activity which should have been turned over to him, he neither demonstrates that there were any investigative reports subject to discovery nor explains how anything in an essentially unrelated investigation could have been

---

[22] Brady v. Maryland, 373 U.S. 83 (1963); Bagley v. United States, 473 U.S. 667 (1985).

exculpatory as to him.  While the court has the inherent
power in the PCR context to order discovery when the
interests of justice so require, see State v. Marshall, 148
N.J. 89, 268-69, cert. denied, 522 U.S. 850, 118 S.Ct. 140,
139 L. Ed.2d 88 (1997), here appellant has failed to
demonstrate either that the materials he has demanded exist
or that they in any way contain information that might be
exculpatory.  That being true, appellant has not
demonstrated any right to further discovery and his
application as a part of this appeal is therefore denied.

(October 3, 2002 Appellate Division Opinion, at Ra1844-Ra1845).

Thereafter, petitioner made a motion for a new trial based
upon newly discovered evidence; namely, that he learned for the
first time on the remand hearing that the victim and the co-
defendants were members of rival gangs.  In a written letter
decision dated January 27, 2004, Judge Neustadter found
petitioner's contention "incorrect."  (Ra1974).  Further, Judge
Neustadter held that the gang activity evidence was not material
to the outcome of the case:

When the defendant was questioned by Investigator Folks he
stated he did not want to say anything regarding the
shooting of the victim for fear that someone may hurt him or
his girlfriend.  It was this statement, given by the
defendant himself, which started any discussion relating to
gang activity in this case.  Therefore the only relation
that any ongoing gang activity had to the instant case was
merely to provide a backdrop to explain the meaning of the
defendant's statement at both the original Miranda hearing
and the remand hearing.  Any information regarding gang
activity did not speak to the circumstances of the shooting
itself or any other material matter.

(Ra1974).

The trial judge also determined that petitioner knew of the
gang evidence before trial.  Relying on Investigator Folks'

56

testimony at the first <u>Miranda</u> hearing,[23] the court stated that, "prior to trial there was mention of two warring gangs or groups in the Atlantic City area, and the relationship between these gangs or groups was tangentially related to the crime."  The court went on to state:

> Also the defendant's own statement to the police during questioning, that he did not want to speak for fear of retribution against him or his girlfriend speaks to the question of whether or not the defendant had knowledge of gang activity.  This very statement made by defendant himself suggests knowledge that there was gang activity in Atlantic City at the time of the crime.  Based upon these facts the defendant has failed to show that the evidence of gang activity could not have reasonably been discovered prior to trial, as the second prong of the above test requires.

(Ra1975).

The court next found that the gang evidence probably would not have affected the result of the trial:

---

[23]  At the original <u>Miranda</u> hearing, Folks testified:
Q: And what did [defendant] then do with respect to Jesse Rice?
A: He [defendant] told me that he made him [Jessie Rice] get on the ground.  He didn't say why he made him get on the ground.  That he had the gun to his head a couple times.  Terry Bailey tried to pull the gun away from Jessie's head ...  That he told him not to shoot him, don't shoot him, and I asked Shawn, why did you shoot him.  He said because he had already seen our faces, he knows who we are.  He said Terry Bailey told him we would just go to war, it [sic] his word against ours.  When they bring the guys from Pitney to go to war with the guys from Virginia Avenue Courts, they would just fight it out.  Shawn said no, F that, and he shot him.

(Transcript of May 14, 1991 <u>Miranda</u> hearing, 32:6-22).

... any evidence of gang activity was used solely to place
the defendant's statement to the police, that he feared
retribution if he spoke about the crime, in a context for
the court to evaluate the defendant's claim that he invoked
his right to remain silent.  The defendant has entirely
failed to assert any support for the contention that any
gang related evidence would add any value to the defendant's
claim of innocence or negate his guilt in any way.

(Ra1975).

Finally, the court found no <u>Brady</u> violation:

The defendant also alleges that the prosecutor's failure to
disclose evidence relating to gang activity violates the
longstanding precedent set forth in <u>Brady v. Maryland</u>, 373
U.S. 83 (1963) and <u>Bagley v. United States</u>, 473 U.S. 667
(1985).  Specifically the defendant contends that the
prosecutor's failure to disclose verbal intelligence
received from other law enforcement agencies pertaining to
gang activity is a violation of <u>Brady/Bagley</u>.  In order to
succeed on this claim it is necessary that the defendant
show that the material that was allegedly suppressed by the
prosecutor would create "a reasonable probability that, had
the evidence been disclosed to the defense, the result of
the proceeding would have been different."  <u>Id</u>. at 682.  A
"reasonable probability" is a probability that would be
sufficient to undermine the outcome.  <u>Ibid</u>.

In the instant case any evidence of gang activity related
only to the defendant's claim that he invoked his right to
remain silent.  Because the issue of gang activity is solely
relevant if at all, to provide a backdrop and context to the
statements made by the defendant during his questioning.  It
can hardly be claimed that there is a reasonable probability
that the outcome of the defendant's trial would have
changed.

(Ra1975-Ra1976).

Ukawabutu appealed Judge Neustadter's ruling.  The Appellate
Division held:

The "newly discovered" evidence upon which defendant now
relies, as we understand it, is an admission by the Atlantic

58

City investigators that there was no written intelligence
reports linking the defendant, Welsh and Bailey to the
Abdullahs.  Defendant asserts that this information would
have undermined the basis for a finding that defendant's
disinclination to speak related to his fear of the
Abdullahs.  The claim fails on several levels.

Initially, the evidence is not material.  Neither Juliano
nor Folks suggested that written intelligence supporting
their claimed knowledge of gang ties existed.  Indeed, as we
have seen, Juliano specifically disclaimed knowledge of any
such reports.  Accordingly, if anything, this evidence does
nothing more than support the testimony of the
investigators.

For the same reason, we cannot comprehend how the evidence,
if presented to Judge Neustadter, could have affected the
outcome of the remand hearing.  The judge had heard from the
State's witnesses that no such written reports existed.
Defendant was able to suggest that the contention drawn by
the witnesses between the defendant and the Abdullahs should
be discredited exactly as he has done on the application for
a new trial.  In this sense the evidence is not "new" at
all; it was well-known at the remand hearing.

Judge Neustadter rejected defendant's position and, for the
reasons we have just set out, we agree with that
determination.  Defendant also argues that the State's
testimony at the remand hearing "was false testimony" and
that this claim was analyzed by the remand court "under the
[wrong] standard ...."  That claim does not have sufficient
merit to justify discussion in a written opinion.  R. 2:11-
3(e)(2).

(December 9, 2005 Appellate Division Opinion, at Ra2291-Ra 2293).

Ukawabutu now revises his original Brady/Bagley claim and

contends prosecutorial misconduct under Napue v. Illinois, 360

U.S. 264 (1969) and Giglio v. United States, 405 U.S. 150

(1972).[24]  In Napue and Giglio, the Supreme Court held that a

---

[24]  Ukawabutu argues here, as he does in much of his
petition, that because the state courts did not expressly address

defendant's right to due process is implicated when the state
obtains a conviction based upon testimony the state knows is
perjured.  Napue, 360 U.S. at 269; Giglio, 405 U.S. at 153-55.
When the "reliability of a given witness may well be
determinative of guilt or innocence," use or acquiescence of
false testimony affecting credibility falls within this general
rule.  Napue, 360 U.S. at 269; see also Giglio, 405 U.S. at
154.[25]  The Supreme Court quoted the New York Court of Appeals in
a similar case:

> It is of no consequence that the falsehood bore upon the
> witness' credibility rather than directly upon defendant's
> guilt.  A lie is a lie, no matter what its subject, and, if
> it is in any way relevant to the case, the district attorney
> has the responsibility and duty to correct what he knows to
> be false and elicit the truth. ...  That the district
> attorney's silence was not the result of guile or a desire
> to prejudice matters little, for its impact was the same,
> preventing, as it did, a trial that could in any real sense
> be termed fair.

---

this Napue/Giglio claim, AEDPA deference should not apply.
However, this Court finds that the substance of his claim was
sufficiently presented to and considered by the state court under
the related Brady/Bagley claim.  Petitioner's factual assertions
are no different; rather, he simply attaches another label on
this claim of false testimony and prosecutorial misconduct in
proffering the allegedly false testimony and failing to provide
discovery of the intelligence reports referenced by the
investigators in their testimony at the remand hearing.

[25]  In Giglio, the Supreme Court found that the government's
case against Giglio "depended almost entirely on Taliento's
testimony; without it there could have been no indictment and no
evidence to carry the case to the jury.  Taliento's credibility
as a witness was therefore an important issue in the case, and
evidence of any understanding or agreement as to a future
prosecution would be relevant to his credibility and the jury was
entitled to know of it."  405 U.S. at 154-55.

Napue, 360 U.S. at 269-70 (quoting People v. Savvides, 1 N.Y.2d.
554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854-855 (1956)).

Here, this Court finds no merit to petitioner's contention
that the prosecutor allowed false testimony to go uncorrected
with respect to the testimony of Folks and Juliano at the remand
hearing on the Miranda issue in violation of Napue/Giglio.
First, the facts in Napue and Giglio are distinguishable from
this case.  In both Napue and Giglio, the state's eyewitnesses,
who were either facing the prospect of prosecution or who had
already been convicted, falsely testified that they had not been
promised consideration from the state in return for their
testimony at trial.  The state prosecutors knew the testimony of
their key witnesses were not true.  In contrast here, there is no
indication that the investigators' testimony about gang
associations was false.  The mention of warring gangs in Atlantic
City and the victim's and co-defendant's associations with the
rival gangs were already known to petitioner.  Indeed, the
supplemental reports regarding the various interviews of
petitioner, the co-defendants, the informant Derrick Ingram, and
others by the Investigators Juliano and Folks are replete with
references to gang associations.  These reports already had been
provided as part of discovery in the criminal proceedings.
(Ra1571 - Ra1595).  And the investigators testified that any
intelligence they received on the gang activity was verbal, and
not produced in any written investigation report.  Thus, there

was no unambiguously false testimony here, as there was in <u>Napue</u> and <u>Giglio</u>.

Further, the information about gang activity was not material to the outcome of the case.  The testimony occurred in the second (or remanded) <u>Miranda</u> hearing, not at trial.  The investigators testified about the gang activity merely to provide a context to explain their understanding of petitioner's statement that he was afraid for himself and his pregnant girlfriend if he talked.  Thus, the gang testimony did not relate to the actual circumstances of the shooting or petitioner's involvement in the murder.  It was simply tangential to the crime.  Moreover, the investigators were not the lynchpin in the State's case against petitioner, unlike the key witnesses in <u>Napue</u> and <u>Giglio</u> who testified about the defendants' involvement in the respective crimes.

In addition, this allegedly "false" testimony could not, in any reasonable likelihood, have affected the determination of guilt.  As mentioned above, the gang activity was not the keystone of the State's case.  Moreover, the investigators were subjected to a cross-examination by defense counsel at the remand hearing to impeach the officers' credibility about the meaning of petitioner's statement concerning his fear for himself and his girlfriend.  Thus, the judge, who was the trier of fact in the bench trial, was able to assess the credibility of these

witnesses on that issue, which was separate from the ultimate determination of petitioner's guilt.

Next, this Court finds that the state courts' determination of this issue, although based on a Brady/Bagley analysis, was not an unreasonable application of federal law or an unreasonable determination of the facts presented in the state court proceeding.  Relief under Brady/Bagley is available only if petitioner can show a reasonable probability that, had the gang evidence been disclosed, the result of the trial would have been different.  Bagley, 473 U.S. at 682.  The state court properly applied Brady/Bagley and determined that the testimony concerning gang activity was not unknown or newly raised at the remand hearing, and that the testimonial evidence was not material to the outcome of the case because it was related only to petitioner's claim that he invoked his right to remain silent, and not to the circumstances of the crime or petitioner's involvement in the murder.  Coloring the claim as a Napue/Giglio claim does not alter this determination because a Napue/Giglio claim also requires that, in addition to being false, the evidence must be material to the outcome of the case as required under Brady.  See Giglio, 405 U.S. at 154.

Finally, this Court finds that petitioner has failed to demonstrate any prosecutorial misconduct in Investigator Folks and Juliano's testimony at the second Miranda hearing.  To be actionable, a prosecutor's conduct must be such that it "so

infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Here, petitioner cannot point to any evidence that the testimony was false. The prosecutor did not fail to provide written reports about gang activity because there were, in fact, no written reports in existence. The investigators also testified that the intelligence reports they received regarding gang activity were verbal and not written. Moreover, as noted above, the testimony at the remand hearing was subjected to cross-examination for impeachment purposes, and was tangentially related to a determination of petitioner's involvement in the crime, thus negating any unfair result in the determination of guilt.

For all of these reasons, petitioner's false testimony/prosecutorial misconduct claim will be denied for lack of merit.

D.  Claim Alleging Violation of Confrontation Clause

In Ground Nine of his petition, Ukawabutu asserts that the trial court relied on an out-of-court hearsay statement by a co-defendant, Darryl Welch, in making his determination of guilt, in violation of petitioner's Sixth Amendment right to confront witnesses against him. During the first suppression hearing on May 14, 1991, Investigator Folks testified that co-defendant Welch told petitioner, "you did it, why don't you tell the

truth." Defense counsel objected to the testimony as hearsay; however, the judge overruled the objection and allowed the statement because it was not being offered for the truth of the statement, but rather to explain the setting in which Ukawabutu gave his confession. (May 14, 1991 <u>Miranda</u> hearing transcript at 24:23-25:24). However, at trial, the prosecutor sought to have Investigator Folks' testimony at the <u>Miranda</u> hearing incorporated as part of the evidence for use in the court's determination. Defense counsel made no objection at that time.

At the conclusion of the guilt-phase of trial, the trial judge stated in his findings of fact:

> These findings of fact or these findings of guilt are based upon findings of fact. As I said before, I can make general findings but I will make them specific by saying that essentially the facts in this case are based upon the statement made by Mr. Jackson on the evening when these three people were in City Hall or the Major Crime Squad, where the suspects were brought in, questioned separately. At first, Mr. Jackson denied any complicity or involvement; ultimately changed his story to say that Mr. Welch did it all, and that there was some bad blood between him and Rice because of a girl.
>
> Later on, he was brought back to the Major Crimes Squad office. He was confronted with information that would indicate that the police had other information indicating that Jackson was the perpetrator, and the police brought the three together. Welsh stated to Mr. Jackson, "You did it, you know you did it, why don't you tell the truth."
>
> Other confrontations of that sort took place, and ultimately Mr. Jackson admitted his complicity and that he was the one that pulled the trigger, and ultimately made a taped statement which is in evidence.

(May 15, 1991 trial transcript at 67:16-68:12).

Ukawabutu contends that the trial judge relied on Welch's statement as proof of petitioner's guilt. However, Welch never testified in either the <u>Miranda</u> hearing or the trial proceedings.

This claim was raised by petitioner in his <u>pro</u> <u>se</u> supplemental brief on direct appeal. The Appellate Division expressly noted petitioner's confrontation clause claim but did not discuss it. In its published opinion, the Appellate Division fully discussed but rejected Ukawabutu's waiver of jury trial claim and remanded the matter for a new suppression hearing on the Fifth Amendment claim raised by petitioner in his <u>pro</u> <u>se</u> brief. The Appellate Division noted, with regard to the Fifth Amendment claim, that "[i]f the defendant's oral and tape recorded statements are deemed admissible, defendant's conviction will be affirmed. <u>State v. Kelly</u>, 61 N.J. 283, 294, 294 A.2d 41 (1972). We will retain jurisdiction to consider defendant's appeal in that event respecting the excessiveness of his sentence." <u>State v. Jackson</u>, 272 N.J. Super. 543, 565 (App. Div. 1994). Thus, it would appear that the Sixth Amendment confrontation clause claim was rejected as meritless without discussion.

The Sixth Amendment's Confrontation Clause provides that, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Recently, the Supreme Court has traced the historical roots of the Confrontation Clause and has distinguished the application of the

Confrontation Clause to different types of hearsay evidence.  <u>See</u>
<u>generally</u> <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).

> Where nontestimonial hearsay is at issue, it is
> wholly consistent with the Framers' design to afford
> the States flexibility in their development of hearsay
> law -- as does [<u>Ohio v. ]Roberts</u>, [448 U.S. 56, 66
> (1980),] and as would an approach that exempted such
> statements from Confrontation Clause scrutiny
> altogether.  Where testimonial evidence is at issue,
> however, the Sixth Amendment demands what the common
> law required:  unavailability and a prior opportunity
> for cross-examination.  We leave for another day any
> effort to spell out a comprehensive definition of
> "testimonial."  Whatever else the term covers, it
> applies at a minimum to prior testimony at a
> preliminary hearing, before a grand jury, or at a
> former trial; and to police interrogations.  These are
> the modern practices with closest kinship to the abuses
> at which the Confrontation Clause was directed.

<u>Crawford</u>, 541 U.S. at 68 (footnote omitted).[26]  <u>See also</u> <u>Davis v.</u>
<u>Washington</u>, 126 S.Ct. 2266 (2006) (statements taken by police in
the course of an interrogation are "nontestimonial," and are not
subject to the Confrontation Clause, when they are made under
circumstances objectively indicating that the primary purpose of
the interrogation is to enable police assistance to meet an
ongoing emergency; statements taken by police in the course of
interrogation are "testimonial," and subject to the Confrontation

---

[26] In <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980), the Supreme
Court held that the Confrontation Clause does not preclude the
admission of an unavailable witness's hearsay statement if it
bears "adequate indicia of reliability."  Under <u>Roberts</u>, a
hearsay statement contains such "adequate indicia of reliability"
if it falls within a "firmly rooted hearsay exception" or if it
bears "particularized guarantees of trustworthiness."  448 U.S.
at 66.

Clause, when the circumstances objectively indicate that there is no ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution).  The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  Crawford, 541 U.S. at 59 n.9 (citing Tennessee v. Street, 471 U.S. 409 (1985)).

The Court of Appeals for the Third Circuit has not addressed the issue whether Crawford applies retroactively.  Most Circuit Courts, however, have held that it does not, on the rationale that newly promulgated rules of criminal procedure generally do not apply retroactively to cases on collateral review.  See generally Espy v. Massac, 443 F.3d 1362 (11th Cir. 2006) (Crawford rule does not apply retroactively); Dorchy v. Jones, 398 F.3d 783, 788 (6th Cir. 2005) (same); Murillo v. Frank, 402 F.3d 786, 790 (7th Cir. 2005) (same); Mungo v. Duncan, 393 F.3d 327, 336 (2d Cir. 2004) (same), cert. denied, 544 U.S. 1002 (2005); Brown v. Uphoff, 381 F.3d 1219, 1227 (10th Cir. 2004) (same), cert. denied, 543 U.S. 1079 (2005).  Contra Bockting v. Bayer, 399 F.3d 1010, as amended, 408 F.3d 1127 (9th Cir. 2005), cert. granted, 126 S.Ct. 2107 (2006).

In any event, Confrontation Clause errors are subject to harmless error analysis.  See U.S. v. Reynolds, 171 Fed.Appx. 961, 966, 2006 WL 760291, *4 (3d Cir. 2006) (citing Delaware v.

Van Arsdall, 475 U.S. 673, 684 (1986)); United States v. Al-Sadawi, 432 F.3d 419, 426 (2d Cir. 2005)).  See also United States v. Arriola-Perez, 137 Fed.Appx. 119, 133, 2005 WL 1463502, *11 (10th Cir. 2005), cert. denied, 126 S.Ct. 1024 (2006).

Prior to the Crawford opinion, the Court of Appeals for the Third Circuit had held that, under certain circumstances, police officers may reveal information received out-of-court for the limited purpose of establishing background or context for the officers' actions.  See United States v. Sallins, 993 F.2d 344 (3d Cir. 1993).  At the same time, the Court noted the potential for abuse.

> "In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct.  His testimony that he acted 'upon information received,' or words to that effect, should be sufficient.  However, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great."

Sallins, 993 F.2d at 346 (quoting 2 McCormick on Evidence § 249, at 104 (4th ed. 1992)).  See also United States v. Lopez, 340 F.3d 169 (3d Cir. 2003) (again recommending the use of "general terms" to provide background for police activities); United States v. Price, 2006 WL 1795108 (3d Cir. June 30, 2006) ("Police officers are permitted under Sallins to explain the background context for their arrival at a scene.  When the explanation

69

cannot be effected without relating some contents of the information received, <u>Sallins</u> does not prohibit admission of such details.").

Here, Investigator Folks' testimony at the <u>Miranda</u> hearing included a hearsay statement attributed to Darryl Welch.  The trial court determined that the statement was being offered for purposes other than for its truth, namely to provide a backdrop for petitioner's confession.  Thus, the court found that the non-testimonial hearsay introduced through Folks met state-law evidentiary rules for the admission of Folks' testimony concerning Darryl Welch.

Moreover, the prosecutor did not attempt to introduce or use either statement made by the co-defendants during their own custodial interrogation that implicated Ukawabutu as the shooter at the time of trial.  Based on these circumstances, and the fact that the trial judge plainly did not consider Welch's statement in determining petitioner's guilt, this Court finds no violation of the Confrontation Clause with respect to Folks' testimony at the first <u>Miranda</u> hearing.  To the extent this testimony did violate the Confrontation Clause, any error was harmless beyond a reasonable doubt given petitioner's own confession which was substantially corroborated by other evidence.  Indeed, the trial court recited the corroborating evidence as follows:

> There is the dead body with seven bullet holes in it, the body that belongs, that is, Mr. Rice's body.  That certainly is corroboration of a homicide.

> There is the person who transported the three people back to Atlantic City from the mall, which is exactly the way Mr. Jackson described it in his final statement.
>
> There is a burned automobile which was in the location where Mr. Jackson said that it was burned.
>
> There is certainly plenty of corroborating evidence to substantiate everything that he said to the police when he made that statement.
>
> So that I think the evidence is crystal clear and is beyond any reasonable doubt that he is guilty of what he is charged with and I find him guilty.

(May 15, 1991 trial transcript at 69:12-70:2). Accordingly, because the statement by Welch was not used to prove petitioner's guilt, Ukawabutu is not entitled to relief on his Confrontation Clause claim for relief.

E.   Michigan v. Mosley Claim

Ukawabutu also contends that the police failed to scrupulously honor his invocation of his right to remain silent. He argues that when he told Investigator Juliano that he did not want to say anything about what happened because he was afraid for himself and pregnant girlfriend, the police should have discontinued their interrogation, or at the least, Investigator Folks should have re-administered the Miranda rights.

Ukawabutu raised this issue in his pro se brief on direct appeal. The Appellate Division remanded the matter for a new suppression hearing to determine the admissibility of petitioner's confession based on whether petitioner's statement operated as an invocation of his right to remain silent, which

71

the investigators should have honored.  After the second Miranda

hearing, the trial court determined that there was no Fifth

Amendment violation:

> It is clear to me, as it was to the investigators, that the emotions expressed when defendant thereafter uttered, "I'm afraid to tell because someone might hurt me or my girlfriend," did not in any manner implicate his rights of silence pursuant to the Miranda Rights or the silence privilege of the Fifth Amendment to the U.S. Constitution. Rather, those words were meant to convey the fact that Jackson had relevant knowledge which he wanted to tell but feared retribution by Welch or his people.

> While law enforcement officials must scrupulously honor words of a defendant which reasonable [sic] seek to invoke the privilege against self-incrimination, they are not obliged to accept any possible momentary hesitation of the flow of information as an expression of a desire to terminate questioning.  See State v. Bey (II), 112 N.J. 123 (1988).

> Indeed, defendant's expressed fear did not in any way involve law enforcement or the process that was taking place, but conveyed apprehension of an outside force.  In fact, defendant, by his utterance, was affirming that he wanted to tell his version, but that he was reluctant to do so by the looming existence of the Abdullahs.  Nowhere does this concept include a desire to be silent, but is, to the contrary, an invitation to the investigators to alleviate the problem so that the defendant might be able to cooperate with impunity. ...  Indeed, I find neither investigator believed defendant was seeking to invoke by those words his right to remain silent, and I find as a fact he did not invoke that right.  Nor was there an equivocal invocation of it.  I accordingly conclude there was no duty on the part of law enforcement to honor an invocation.

> . . .

> Although this court finds beyond a reasonable doubt that no violation of the Hartley doctrine has occurred in that there was no invocation, I am constrained to continue the legal analysis to address, hypothetically, the question of whether, assuming an ambiguous invocation was meant by

defendant's words, the first oral and tape recorded
statements (not offered by the State at trial) were a result
of the failure of the Prosecutor's investigators to
scrupulously honor his invoked rights to silence and whether
the second oral and tape recorded statements (offered by the
State at trial) were tainted by a violation, if any, of
defendant's rights.

Once the right to remain silent has been invoked it must be
"scrupulously honored." Michigan v. Mosley, 423 U.S. 96,
102-03 (1975). However, where police, following a suspect's
equivocal indication of desire to stop questioning, are
unsure whether the suspect has asserted his right to remain
silent they may then clarify whether there was an intention
to invoke State v. Bey (I), 112 N.J. 45 (1988).

Although the testimony is that Folkes [sic] did not
literally "clarify" the question of invocation, it is clear
that he addressed these circumstances that same was
tantamount to clarifying the invocation and that a
resumption of questioning after defendant was satisfied was
appropriate. See Johnson, 120 N.J. at 284. Therefore, I
find that what was done was a more reasonable alternative
than a cessation of questioning, and that the first oral and
taped statements are not tainted by an invocation and are
admissible.

(September 21, 1994 Findings of Fact and Conclusions of Law, at

Ra1939-Ra1943).

The trial court also found that, to the extent the utterance

by petitioner concerning his safety and that of his girlfriend

could have been construed as an equivocal invocation of his right

to remain silent, thus rendering the first oral and taped

statements inadmissible, the second oral and taped statements

made much later that day were not tainted.

The defense contends pursuant to Hartley and Wong Sun v.
U.S., 371 U.S. 471 (1963), that the second statements must
be suppressed as "fruit of the poisonous tree" if it were
deemed that the police did not scrupulously honor the
invocation by taking the earlier oral taped statements.

73

The New Jersey Supreme Court in <u>Hartley</u>, instructed that in
a case such as this, where there was an invocation of
defendant's right to remain silent, a subsequent statement,
and a second statement following the first, the
admissibility of the second statement is "determined by
whether the prosecution could establish either that the
[second] statement was not the <u>product</u> of the first ... or
that the 'taint' of the first statement was attenuated."
<u>Hartley</u>, 103 N.J. at 233.  The court states specifically
that the factors relevant to such a determination include
the time between statements, any intervening circumstances,
whether the defendant received an adequate warning of his
rights, the effect of defendant's initial statement, and the
purpose and flagrancy of the police misconduct.


Using those factors, I find there was a significant time gap
from the purported failure to honor (approximately 10:30
a.m.) And the making of the second statement (6:00 p.m.).
Also, the <u>Miranda</u> rights were repeated twice during the
interval of time and there was no trace of an invocation
during that period.


Next, I find that several intervening events occurred during
the time span, including defendant's being returned home, as
well as his conferring with his girlfriend and his
associates.


I further find that the information gained by the
investigators in the first statement did not materially
benefit them, so the actual effect of defendant's initial
statement was virtually nonexistent.  Indeed, confronting
these suspects with the Ingram statement, which itself
implicated each suspect in the homicide, would likely have
been enough to persuade the others to cooperate.
Additionally, the police could have accomplished the
cooperation of Welch and Bailey by pretending that Jackson
implicated them by way of statement against them, even if no
such statement had ever been made.  Since the same result
could have been reached with or without defendant's first
statement, the actual statement was of no value.


The situation here is easily distinguishable from one where
initial incriminating information illegally obtained from
defendant made it difficult for him to act freely from the
effect of his prior admissions.  In the present case, any
realistic connection with the hypothetical prior illegality
is attenuated at best.

74

(September 21, 1994 Findings of Fact and Conclusions of Law, at Ra1944-Ra1945).

On appeal, the Appellate Division affirmed, succinctly holding that "[t]he trial court's findings are supported by adequate and credible evidence in the record."  (Ra1949).

The Fifth Amendment to the United States Constitution provides in part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself ... ."  U.S. Const. amend. V.  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that in order to protect an accused's Fifth Amendment right against self-incrimination during the inherently coercive custodial interrogation setting, certain procedural safeguards must be employed.  These safeguards include the explicit warning that the accused "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires."  Miranda, 384 U.S. at 479.

In order to fully exercise this right to remain silent under Miranda, a suspect must be able to end questioning by police officers.  Michigan v. Mosley, 423 U.S. 96 (1975).  This right limits the ability of police officers to wear down and coerce a suspect into making an incriminating statement.  Id. at 102.  The Court made clear that police must "scrupulously honor" the

75

suspect's assertion of his right to remain silent.  Further, this requirement is independent of the requirement that any waiver of the right to remain silent be knowing, intelligent, and voluntary.  Id. at 102-03.  Although law enforcement officers must scrupulously honor a suspect's right to terminate interrogation, the right to end questioning does not create a proscription of an indefinite duration.  Id. at 103-04.  A defendant who indicates a desire to remain silent may later waive this right and submit to police requests for further questioning. The earlier choice to remain silent will not render inadmissible statements made subsequent to the waiver.  Id. at 106-07.

This Court finds that the state court determinations on this aspect of petitioner's Fifth Amendment claim did not involve an unreasonable application of established federal law, nor were their decisions based on an unreasonable application of facts in light of the evidence presented in the state court proceedings. The trial judge clearly followed Michigan v. Mosley, the Supreme Court precedent on the issue of whether a defendant's right to cut off interrogation was scrupulously honored.

The state court correctly noted that the State did not use Ukawabutu's first statement at trial, and that the critical issue, assuming arguendo that the ambiguous invocation operated to render that first statement inadmissible, was whether the second statement was tainted by petitioner's first statement so as to bar that second statement from admission at trial.  This

Court agrees that any possible taint was attenuated.  There was a very substantial time gap between the first statement and the second statement, during which time petitioner was not in custodial interrogation, and was in fact, out on the streets and with his girlfriend.  Moreover, the investigators had read Ukawabutu his Miranda rights several times after the first statement was taken and before petitioner gave his second statement, and there was absolutely no evidence that petitioner invoked his right to remain silent, equivocally or not, during this second round of interrogation.  Finally, Ukawabutu's first statement provided no new information that would have aided the police in effecting the second statement.  Petitioner already had been implicated in the murder by Ingram, the police informant, before petitioner was brought in the first time that day.  The tape between Welch and Ingram likely would have persuaded Welch and Bailey to cooperate.  Accordingly, this claim has no merit.

F.   Involuntary Confession Claim

     In his Tenth Claim, Ukawabutu asserts that his confession was involuntary and in violation of his Fifth Amendment right against self-incrimination.  He claims that he was subjected to more than five hours of questioning by the investigators operating in relay teams, that he only gave the statements because he was hot, tired, and wanted to go home as the police said he could if petitioner told them what happened.

Pursuant to the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment, a confession must be voluntary to be admitted into evidence.  See Dickerson v. United States, 530 U.S. 428, 433 (2000).  Miranda provides that the accused may waive his rights, but must do so "voluntarily, knowingly and intelligently".  Miranda, 384 U.S. at 475.

> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.  Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

Miranda, 384 U.S. at 478-79.  The Miranda warnings are a constitutional requirement.  Dickerson, 530 U.S. at 444.  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.  But ... '[c]ases in which a defendant can make a colorable argument that a self-

78

incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'" Dickerson, 530 U.S. at 444.

"[T]he ultimate issue of 'voluntariness' is a legal question requiring independent federal determination," and is thus not subject to the § 2254(d) presumption of correctness. Miller v. Fenton, 474 U.S. 104, 109-110 (1985).

> The Supreme Court has made clear that a statement is
> involuntary when the suspect's "will was overborne in
> such a way as to render his confession the product of
> coercion." Arizona v. Fulminante, 499 U.S. 279, 288,
> 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining
> whether a statement is voluntary, Supreme Court
> precedent requires consideration of "the totality of
> all the surrounding circumstances--both the
> characteristics of the accused and the details of the
> interrogation." Dickerson v. United States, 530 U.S.
> 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)
> (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226,
> 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These
> surrounding circumstances include "not only the crucial
> element of police coercion, Colorado v. Connelly, 479
> U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986),"
> but may also include "the length of the interrogation,
> its location, its continuity, the defendant's maturity,
> education, physical condition, and mental health."
> Withrow v. Williams, 507 U.S. 680, 693, 113 S.Ct. 1745,
> 123 L.Ed.2d 407 (1993) (some internal citations
> omitted).

Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002). "[S]ubsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such

matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable." Dickerson, 474 U.S. at 117.

In determining whether there has been a valid waiver of Miranda rights, a court must conduct a two-part inquiry under a totality of the circumstances standard. Moran v. Burbine, 475 U.S. 412, 421 (1986). First, the court looks to the voluntariness of the statement, and whether the waiver was freely and deliberately given as opposed to being obtained by coercion, intimidation, or deception. Id. Second, the court must consider whether the waiver was "knowingly and intelligently" made, that is, whether the accused was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it." Id.

The "totality of the circumstances" approach is the clearly established federal standard applied to determine whether there has been a voluntary waiver of Miranda rights. A court must take into account "both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). This approach includes the evaluation of the subject's age, education, experience, background, and intelligence, and whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights, the length of detention, the repeated and prolonged nature of questioning, and

the use of physical punishment such as the deprivation of food or sleep.[27]  Id.; see also Fare v. Michael C., 442 U.S. 707, 725 (1979); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994). It looks to the person's familiarity with the criminal justice system, the timing of the Miranda warnings and the statement given, and the length and nature of the interrogation and the accompanying detention.  See United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990); United States v. Vasquez, 889 F. Supp. 171, 177 (M.D.Pa. 1995). See also Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 2151 (2004)(the characteristics of the defendant can include the defendant's age, education, and intelligence, as well as his prior experience with law enforcement).

Further, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986); see also Arizona v. Fulminante, 499 U.S. 279, 288 (1991)(a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion"); Lam, 304

---

[27]  In determining the voluntariness of the confession, New Jersey state courts have traditionally assessed the totality of the circumstances surrounding the arrest and interrogation, including such factors as the accused's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment of mental exhaustion was involved."  State v. Miller, 76 N.J. 392, 402 (1978); see also State v. Presha, 163 N.J. 304, 313 (2000).

F.3d at 264.  Absent police overreaching, which is causally related to the confession, "there is simply no basis for concluding that a state actor has deprived a criminal defendant of due process of law." Connelly, 479 U.S. at 164.  Thus, beyond the necessary and crucial element of police coercion, courts look to both the characteristics of the accused and the circumstances of the interrogation in considering whether a confession is voluntary.  See, e.g., Withrow v. Williams, 507 U.S. 680, 693-94 (1993)(concluding that the voluntariness of the confession depends upon the totality of circumstances, including police coercion, length and place of interrogation, the accused's maturity, education, physical condition, intelligence, and mental health, as well as 'the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation"); Sneckloth, 412 U.S. at 226 (the voluntariness of a statement may often depend on whether the accused's will was overborne, a question that logically turns on the characteristics of the accused).  The government "need prove waiver only by a preponderance of the evidence." Connelly, 479 U.S. at 168.

This Court has carefully reviewed the record and finds that the totality of the circumstances in this case clearly weigh in favor of voluntariness, as determined by the state courts. First, there is no evidence of coercive conduct on the part of

the investigators.[28]   Second, the trial court determined that

petitioner's confession was knowingly and intelligently made.

The court found:

> Now, I find as a fact for purposes of this hearing that Mr.
> Jackson understood his rights, and that he voluntarily,
> knowingly and understandingly waived his rights, that is,
> his right to remain silent and his other rights, and he made
> the statement.
>
> He was in custody.  He was entitled to the warnings he got,
> and I find that his will was not overborne.  Even though it
> is true that the police used methods which some people might
> say are unfair, of confronting a suspect with information
> that they knew that was pointing to this defendant as the
> perpetrator, that is not impermissible police conduct, and
> the defense has submitted no case law which would suggest
> otherwise.  Under those circumstances, the defendant, for
> whatever reasons he saw fit, decided to make the statement
> that he made.

(May 14, 1991 Miranda hearing transcript at 127:21-128:10).

Having reviewed the relevant state court record, in

particular the testimony of the investigators and petitioner at

the first suppression hearing, this Court finds that petitioner's

confession was voluntarily given.

Petitioner was read his rights before he confessed.  His

confession was given within three hours after he was returned to

the MCS Unit from his girlfriend's house.  There was no evidence

---

[28]   Before remanding the case on the narrow issue as to
whether petitioner invoked his right to remain silent before
giving his first statement (the Michigan v. Mosley claim), the
Appellate Division expressly found that petitioner's contention
that his "confession was given under coercive conditions and was
a product of 'unfair police tactics' rendering the confession
involuntary," to be "without merit."  State v. Jackson, 272 N.J.
Super. 543, 553 (App. Div. 1994).

that petitioner was deprived of food, sleep, or other physical needs that would otherwise serve to overbear a person's will.

There also were no factors concerning petitioner's age, mental condition, or education, which would suggest that he did not understand his <u>Miranda</u> rights or the consequences of waiving those rights.  Further, this Court agrees with the state court that there was no overreaching or objectively coercive police conduct that would have overborne petitioner's will under the circumstances here to make petitioner's confession involuntary.  As stated above, there were no physical punishments inflicted on petitioner – he was not deprived of sleep and food and he was not physically threatened or harmed.  The second interrogation, which prompted the confession, was short in duration, only about three hours.  <u>Miranda</u> warnings were given and petitioner waived those rights voluntarily and knowingly.

Moreover, there is no suggestion that the police used unnecessary or overbearing psychological tactics to extract a confession from petitioner.  Rather, the police simply confronted petitioner with the statements by the co-defendants that petitioner did it, and had all three defendants in the room at one point in the interrogation.  During the course of an interrogation, it is generally recognized that the police may use some psychological tactics in eliciting statements from a suspect.  <u>See</u> <u>Frazier v. Cupp</u>, 394 U.S. 731, 739 (1969)(police misrepresentation to defendant that the co-defendant had

confessed was not sufficient to make the otherwise voluntary confession inadmissible); <u>Miller v. Fenton</u>, 796 F.2d 598, 605 (3d Cir.), <u>cert</u>. <u>denied</u>, 479 U.S. 989 (1986); <u>State v. Jacks</u>, 634 F.2d 390, 393 (8th Cir.), <u>cert</u>. <u>denied</u>, 450 U.S. 934 (1981)(representation that cooperation would promote leniency, although no actual promise was made).  The police may "attempt to create a climate which would be conducive to extracting inculpatory information."  <u>Id</u>.

Consequently, after careful review of the record, this Court cannot conclude that the determination of the trial court in admitting petitioner's confession resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  <u>Williams v. Taylor</u>, <u>supra</u>.  The state courts applied the correct law and facts in reaching its determination that there was no <u>Miranda</u> violation, and that the statement was voluntarily and knowingly given.  Petitioner has failed to demonstrate that the state court opinion, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  <u>Matteo</u>, 171 F.3d at 891.  Therefore, the Court will deny federal habeas relief on this claim because the alleged violation of petitioner's Fifth Amendment rights is substantively meritless.

G.  Ineffective Assistance of Trial Counsel

     Petitioner asserts a myriad of ineffective assistance of counsel claims against his trial counsel.  These claims are addressed in Ground Two, Ground Five, and Ground Seven of his petition.

     The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  Id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005), cert. denied, Jacobs v. Beard, 126 S.Ct. 479 (2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir. 2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 688. "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be
> highly deferential.  It is all too tempting for a
> defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has

> proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable.  A fair
> assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time.
> Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption
> that counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be
> considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir. 1996).

If able to demonstrate deficient performance by counsel, the petitioner must also show that counsel's substandard performance actually prejudiced his defense.  Strickland, 466 U.S. at 687. Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. Id. at 695-96.  Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim.  Id. at 697; see also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

Although this is a high burden for a petitioner to satisfy, it is even higher for a petitioner proceeding under the AEDPA:

> For [a petitioner] to succeed, ... he must do more than show
> that he would have satisfied <u>Strickland</u>'s test if his claim
> were being analyzed in the first instance, because under §
> 2254(d)(1), it is not enough to convince a federal habeas
> court that, in its independent judgment, the state-court
> decision applied <u>Strickland</u> incorrectly.  Rather, he must
> show that the [state court] applied <u>Strickland</u> to the facts
> of his case in an objectively unreasonable manner.

<u>Bell v. Cone</u>, 535 U.S. 685, 698-99 (2002)(internal citation
omitted).

1.  *Counsel Ineffective at <u>Miranda</u> Hearing (Ground Two)*

Ukawabutu first contends that trial counsel was ineffective
at his <u>Miranda</u> hearing because he only advanced the argument that
petitioner's statements were involuntary due to being tired and
hot.  He claims that counsel failed to address the issue that his
statements were obtained in violation of his Fourth Amendment
right.  He also argues that counsel did not raise arguments that
the confrontation with co-defendants during interrogation was
flagrant police misconduct, or that petitioner did not fully
understand the <u>Miranda</u> warnings before he waived them.[29]

Petitioner raised this claim in his PCR proceeding.  The PCR
court found that this claim was an attempt to reargue his Fifth
Amendment claims again, and that the issue had "been dealt with
and disposed of accordingly."  The court further observed, under

---

[29]  Petitioner claims that he did not know what Investigator
Folks meant by "the court would appoint an attorney."  He says he
did not understand the word "appoint" and that he could have an
attorney with him during the interrogation.  Petitioner thought
that he had to be before the court for this to apply.  This
testimony was given during the first <u>Miranda</u> hearing.

the Strickland standard, that petitioner had not raised any
viable issues that would have satisfied the prejudice prong.
(April 28, 2000 Letter Opinion of Judge Neustadter, Ra1954 and
Ra1956).

On appeal from denial of the PCR petition, the Appellate
Division found that petitioner's "contentions concerning the
admissibility of his statements" lacked merit because petitioner
did "nothing more than assert that his attorney's conduct was
insufficient."  (October 3, 2002 Appellate Division Opinion,
Ra1967-Ra1968).

This Court likewise finds no merit to petitioner's claim
that counsel was ineffective in the Miranda hearings.  At best,
Ukawabutu highlights arguments as to why his counsel's
representation was deficient, but he fails to show that had
counsel pursued the Fourth Amendment claim or the other Fifth
Amendment issues that the result of the Miranda hearings would
have been different.  This Court has determined that there is no
merit to the Fourth Amendment claim, which had been denied by the
Appellate Division without discussion.  While trial counsel may
have missed the Michigan v. Mosley issue at the first Miranda
hearing, there was no prejudice because the issue was remanded
and a second hearing was held to address the claim.  A review of
petitioner's testimony during the first suppression hearing also
reveals that all of the issues concerning the "plan" by the
investigators to round up the three defendants, petitioner's

claim that he did not know he could have had an attorney during the interrogation and other involuntariness factors were covered on direct and cross examination.  Moreover, this Court has determined that petitioner's Fifth Amendment claims regarding the admissibility of his confession are without merit.

Counsel vigorously pursued the Miranda claim and counsel's performance at the suppression hearings do not rise to the level of constitutionally deficient performance.  This Court further finds that decisions of the state PCR court and Appellate Division were not contrary to the established federal law set forth in Strickland.   The PCR court very carefully set forth and discussed the two-part test under Strickland, and ultimately determined that petitioner could not meet the prejudice prong.  Ukawabutu also has not shown that the state PCR court decision, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  Matteo, 171 F.3d at 891.  Accordingly, petitioner's arguments asserted in Ground Two of his petition are denied for lack of merit.

2.  *The Second Miranda Hearing*

In Ground Four of his petition, Ukawabutu asserts that there was a constructive denial of counsel at his remand hearing on the Miranda issue because counsel was "seriously unprepared and indicated a lack of knowledge of the case and applicable law." He further argues that counsel failed to raise the Fourth Amendment claim, did not call petitioner to testify at the remand

90

hearing, and failed to give a closing summation or submit a brief on petitioner's behalf at the conclusion of the remand hearing.

This Court's review of the transcript on the second <u>Miranda</u> hearing shows that counsel was prepared at the remand hearing. The case was remanded on the very discreet issue of whether petitioner had invoked his right to remain silent.  The Appellate Division already had determined that the confession was not coerced, and rejected the Fourth Amendment claim without discussion.  There simply was no basis for counsel to re-introduce these claims that were already decided.  In fact, the PCR court and Appellate Division found that these Fourth and Fifth Amendment claims had been presented and disposed of accordingly.  Counsel cannot be expected to raise frivolous claims or motions that have been rejected by the courts previously.  This Court finds no merit to the claims asserted in Ground Four of the petition.

3.  *Conflict of Interest Claim*

In Ground Seven of his petition, Ukawabutu argues that his trial counsel was ineffective because of a conflict of interest. This claim was presented in the PCR proceedings.  The PCR court found:

> The defendant and his original attorney, Mr. Preston, had been allegedly involved in a [sic] ongoing conflict.  This issue was addressed by the trial judge and it was decided that it did not warrant the removal of Mr. Preston. However, Mr. Preston eventually removed himself from the case and Mr. Lewis moved up to lead attorney.  The defendant now argues that Mr. Lewis should have removed himself from

the case because of the conflict between himself and Mr.
Preston.  The defendant's argument fails because he offers
no argument or evidence of why a conflict existed between
himself and Mr. Lewis except for his contention that a
conflict existed.

(Ra1954).

The Appellate Division affirmed the denial of the PCR
petition on appeal, finding that Ukawabutu "points to no evidence
of a conflict and no relationship between any conflict and the
presentation of his defense.  Broad conclusory statements and
assertions are insufficient to support the claim of ineffective
assistance."  (October 3, 2002 Appellate Division Opinion at
Ra1843).

Both state courts examined this claim under the <u>Strickland</u>
standard.  This Court finds that petitioner has not shown that
these state court decisions, when evaluated objectively and on
the merits, resulted in an outcome that cannot be reasonably
justified.  <u>Matteo</u>, 171 F.3d at 891.

4.  *Failure to Investigate and Present Witnesses and Defense*

Subsumed in both Ground Four and Ground Seven, petitioner
also argues that trial counsel failed to investigate certain
witnesses and develop any viable defense strategy.  In
particular, Ukawabutu suggests that trial counsel should have
investigated Jerome Williams, Allen Tally, Edward King, Michael
Polk, Ernest Marble, Decarlos Brown, Shannon Rice and Joseph

92

Rice, as well as the gun found at the crime scene.[30]  With the exception of Shannon Rice and Joseph Rice (who were related to the victim and had stated to police that Rice had a gun on him the day he was murdered), the other "witnesses" were people who supposedly saw the victim with "four or five" other black males before his murder.

The PCR court rejected this claim because petitioner "[did] nothing to explain how investigating the statements of the above mentioned people would have helped overcome the incriminating statement of his codefendant Bailey or his own confession." (Ra1954).  In response to the claim that defense counsel failed to develop a viable defense strategy, the PCR court stated that petitioner "fails to put forth any argument that counsel was deficient except for his opinion that counsel was deficient." (Ra1954).

The Appellate Division held:

Here, defendant has done nothing more than assert that his attorney's conduct was insufficient.  While he identifies a large number of alleged failings, none of them has merit. For example, he asserts counsel failed to call witnesses to testify and failed to investigate theories and defenses.  In order to establish a claim that his attorney was ineffective for failing to call witnesses who could have exculpated him, or failing to otherwise investigate, defendant "must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification."  State v. Cummings, [321 N.J. Super. 154, 170 (App. Div.), certif. denied, 162 N.J. 199 (1999)]. [Petitioner] failed to do so. . . .

_____

[30]  The gun was presumed to have belonged to the victim.

> All of his other claims of ineffective assistance are
> equally insufficient, including ... his suggestions about
> potential objections to evidence he believes should have
> been raised, and his argument about motions that should have
> been filed and other defense strategies he believes should
> have been pursued.

(October 3, 2002 Appellate Division Opinion at Ra1842-Ra1843).

"[A]n attorney must investigate a case, when he has cause to do so, in order to provide minimally competent professional representation." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997); Lewis v. Mazurkiewicz, 915 F.2d 106, 111 (3d Cir. 1990). When assessing an ineffectiveness claim based on failure to investigate, a court must assess the decision not to investigate "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691; Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); see also Duncan v. Morton, 256 F.3d 189, 201 (3d Cir. 2001)(2001). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 691-92. Even if counsel was deficient in his decision not to investigate, a petitioner must show a reasonable likelihood that, but for the deficiency, the result of the proceeding would have been different. Lewis, 915 F.2d at 115.

Petitioner's claims as recited above are clearly meritless. Ukawabutu fails to demonstrate what further investigation of

94

these witnesses would have revealed at trial to overcome his
confession.  The witnesses mentioned by petitioner were not
eyewitnesses to the crime, and petitioner has not shown how any
unsubstantiated testimony by Allen Tally, for instance, would
have credibly contradicted the incriminating statements given by
the co-defendants and petitioner.  Thus, petitioner cannot prove
either prong of the Strickland standard.

        Therefore, this Court concludes that the state court
decisions on this ineffective assistance claim were not contrary
to, nor an unreasonable application of, clearly established
federal law.  Further, the state court rulings were not based on
an unreasonable determination of the facts.  See 28 U.S.C.
§ 2254(d).  The state court correctly identified and applied the
governing legal standard under Strickland and reasonably
determined the applicable facts.  Accordingly, this claim for
habeas relief will be denied for lack of merit.

        5.  *Jury Trial Waiver*

        Ukawabutu also claims that counsel was ineffective because
he failed to fully apprise and inform petitioner of his right to
a jury trial and the consequences of waiving his right to a jury.
As set forth above, the state courts found that the jury waiver
was knowing and voluntary.  There was little colloquy on
petitioner's waiver, but it was clear from the record that
Ukawabutu voluntarily waived his right to a jury trial and there
was no suggestion at any time that the right to a jury trial was

not explained to him by counsel.  In addition, this claim was raised on PCR review, and the PCR court found that it had been raised and disposed on direct appeal.  Because this Court finds no merit to petitioner's substantive claim concerning his waiver of a jury trial, the ineffective assistance claim also fails.

This is not to say, however, that one cannot question the wisdom of electing to proceed to trial without a jury on a death penalty case.  Of all the claims asserted by petitioner in this rather large and all-encompassing habeas petition, this issue is the single most troubling issue for this Court to comprehend. Nevertheless, the facts of this case as revealed by the record shows that the decision to forego a jury trial was a strategic one.  And as a strategic decision by counsel, it is virtually unassailable under Strickland.  "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." Strickland, 466 U.S. at 689 (citations omitted).  Thus, whether the decision to forego a jury trial was based on an assumption that the trial court would be more lenient, or because trial counsel may have thought that would have made for a better context to present petitioner's first statement before the court in the Miranda hearing so as to raise doubt about the veracity of petitioner's later confession when the court later made its

ultimate determination of petitioner's guilt, it remains a strategic, tactical decision.

Finally, given the overwhelming impact of a confession, it is unlikely that a jury trial would have reached a different outcome.  Thus, petitioner is unable to prove either deficient performance or prejudice under Strickland.

H.   Ineffective Assistance of Appellate Counsel

Finally, this Court reviews petitioner's claim that his appellate counsel was ineffective.  Ukawabutu asserts that appellate counsel failed on direct appeal to raise the Fourth Amendment Claim, the Confrontation Clause claim, and the Fifth Amendment claim that police failed to scrupulously honor his invoked right to remain silent.  He also argues that counsel should have insisted that the case not be remanded because the tape of the first statement was available for the Appellate Division's review to decide the issue raised under Michigan v. Mosley.

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985).  Claims of ineffective assistance of appellate counsel are evaluated under the Strickland standard.  See Smith v. Robbins, 528 U.S. 259, 285 (2000); Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004); United States v. Cross, 308 F.3d 308, 315 (3d. Cir. 2002); Wright

97

v. Vaughn, 2004 WL 1687865, *6, n.10 (E.D. Pa. July 26, 2004),
aff'd, 473 F.3d 85 (3d Cir. 1006).  Appellate counsel does not
have a duty to advance every nonfrivolous argument that could be
made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a
petitioner may establish that appellate counsel was
constitutionally ineffective "if he shows that counsel omitted
significant and obvious issues while pursuing issues that were
clearly and significantly weaker."  Mayo v. Henderson, 13 F.3d
528, 533 (2d Cir. 1994).

Moreover, in order to prevail on a claim that appellate
counsel was ineffective, a petitioner must show not only that
counsel's performance fell below an objective standard of
reasonableness, but also that there was a reasonable probability,
but for counsel's deficiency in raising the arguments on appeal,
that the conviction would have been reversed on appeal.  See
Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999), cert.
dismissed, 527 U.S. 1050 (1999).

Petitioner raised this claim in his PCR proceedings, and the
PCR court rejected them.  On appeal, the Appellate Division
affirmed, finding that:

> His complaints about appellate counsel are similar, flowing
> from his insistence that evidence he believes should have
> been a part of the record was overlooked and his argument
> that the issues raised in his direct appeal regarding his
> constitutional claims as to his arrest and prosecution have
> been incorrectly decided.  He has done nothing more than to
> simply assert that he believes that a different appellate
> strategy would have been more effective or that a more
> aggressive approach would have carried the day.  All of

98

these arguments fail to identify either a deficient
presentation on his behalf by counsel or to demonstrate that
the outcome would have been any different had the course he
suggests been followed.  They do not rise to the level of a
*prima facie* case of ineffective assistance sufficient to
call for an evidentiary hearing, <u>State v. Preciose</u>, <u>supra</u>,
129 N.J. at 462-63, nor do they demonstrate by a
preponderance of the credible evidence that he was entitled
to PCR relief.

(October 3, 2002 Appellate Division Opinion at Ra1843-Ra1844).

Based on review of the record, this Court finds that
petitioner fails to establish ineffective assistance of appellate
counsel because he cannot show that a different outcome would
have resulted on appeal if counsel had raised the arguments as
suggested by petitioner.  Indeed, all of these claims were raised
by petitioner <u>pro</u> <u>se</u>, on direct appeal, and reviewed by the
Appellate Division.  Further, as the state court decisions, and
this Court on habeas review, have determined that these various
Fourth, Fifth, and Sixth Amendment claims were substantively
meritless, there is no showing that counsel's performance was
deficient.  Therefore, this claim of ineffective assistance of
appellate counsel will be denied.

## VI.  <u>MOTION FOR AN EVIDENTIARY HEARING</u>

Ukawabutu also filed a motion for an evidentiary hearing on
his claims of ineffective assistance of trial counsel and the
Fourth Amendment claim.  As this Court has determined that the
petition must be denied and that all of the claims asserted are
lacking in substantive merit, the motion for an evidentiary
hearing is denied as moot.

VII.   <u>CERTIFICATE OF APPEALABILITY</u>

This Court next must determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

<b><u>CONCLUSION</u></b>

For the above reasons, this Court finds that the § 2254 habeas petition should be denied on the merits and a certificate of appealability will not issue.  An appropriate Order follows.


                              _s/Noel L. Hillman_____
                              NOEL L. HILLMAN
                              United States District Judge


Dated: April 24, 2008
At Camden, New Jersey